896 P.2d 889

STATE of Hawai'i, Plaintiff–Appellant,

v.

Roberto LOPEZ, Miguel Angel Cesena, Jose Angel Gonzalez, Daniel Kalani Hauanio, Kelly Jo Hauanio, David Resquer, aka "El Chino," Manuela Quintero, Rosie E. De Anda, aka Elvira Montana, and Alan Hara, Defendants–Appellees.

No. 17280.

Supreme Court of Hawai'i.

May 16, 1995.

436

G. Kay Iopa, Deputy Pros. Atty., County of Hawai'i, on the briefs, Hilo, for plaintiff-appellant.

Robert B. Tully, on the briefs, Hilo, for defendant-appellee Daniel K. Hauanio.

Ira Leitel, on the briefs, Kamuela, for defendant-appellee Kelly J. Hauanio.

Before MOON, C.J., and KLEIN, LEVINSON, NAKAYAMA and RAMIL, JJ.

RAMIL, Justice.

The plaintiff-appellant State of Hawai'i (the prosecution) appeals from the Third Circuit Court's order granting a motion to suppress evidence and for the return of all noncontraband property to the defendants-appellees Daniel K. Hauanio (Daniel) and Kelly J. Hauanio (Kelly) (collectively the Hauanios). On appeal, the prosecution argues that the circuit court erred in: (1) determining that the initial entrance of Detective Steven Guillermo into the Hauanios' house violated both the Fourth Amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution; (2) setting aside the warrant to search the Hauanios' house and suppressing evidence obtained as a result of that search; (3) suppressing statements made by the Hauanios during custodial interrogations; and (4) suppressing all evidence recovered as a result of information provided in the custodial interrogations including evidence obtained in a search of the Hauanios' hotel room.

We disagree with all of the prosecution's points of error on appeal, inasmuch as they allege that the evidence in question was constitutionally obtained by the police. In addition, although we agree with the prosecution that this court should adopt the "inevitable discovery" exception to the exclusionary rule, we disagree that the prosecution, based on the record before us, has sufficiently demonstrated that the evidence suppressed at trial would have been "inevitably discovered" by the police via lawful means. We therefore affirm the circuit court's order granting the Hauanios' motion to suppress evidence.

## I. BACKGROUND

The trial court's findings of fact (FOFs) (along with additional relevant facts that are consistent with the FOFs and supported by the record) can be summarized as follows: On October 28, 1992, Sergeant Stephen Magnani was assigned to investigate a drug-related conspiracy. Sergeant Magnani concluded that a substantial amount of cocaine had recently been delivered to one of the houses on Kala Street in Puna, on the island of Hawai'i. The Hauanios lived in a house on Kala Street. Sometime around midnight on Friday, November 6, 1992, three armed men wearing masks broke into the Hauanios' home, demanding money and drugs. The Hauanios gave the men some cash and cocaine. Not satisfied with the amount of cash given them, the men permitted Kelly to telephone her mother, Patricia L. Cooper, and ask for more. During the conversation, Kelly was able to communicate the need for help to her mother. Her mother then contacted the police. Realizing that the police had been contacted, the three men fled the scene in the Hauanios' truck.

Shortly thereafter, the police arrived. Kelly's mother, who lived in the area, also arrived. The police asked the Hauanios some questions and took photographs of the crime scene. The Hauanios informed the police that the robbers had taken their truck. Several of the officers suspected that the robbery was a drug "rip-off" because of the use of masks and weapons. The officer in charge informed the Hauanios that the police would continue investigating the robbery and that a detective would be contacting them. Kelly then informed the supervising officer that they were afraid to remain at their residence and that her mother, who was present at the time, would know how to contact them. The police, the Hauanios, and Kelly's mother left the residence between 2:00 a.m. and 3:00 a.m. on Saturday, November 7, 1992. The front door to the house, which had been damaged when the robbers first broke in, was barricaded shut, and the door on the side of the house, which could not be locked, was closed.

At approximately 5:45 a.m. that same morning, Detective Guillermo was assigned to continue the robbery investigation. A few hours later, Detective Guillermo telephoned Kelly's mother. Detective Guillermo told Kelly's mother that he wanted to interview Kelly and Daniel about the robbery and that he wanted to go into the Hauanios' house to continue the investigation. Kelly's mother informed Detective Guillermo that the Hauanios were staying at the Hilo Hawaiian Hotel in Hilo, Hawai'i. Detective Guillermo

did not telephone the Hauanios directly to request an interview or for permission to enter their house. Instead, he proceeded to Kelly's mother's house and asked her if she would telephone Kelly and make the request for him.[1] Kelly's mother telephoned the Hauanios at their hotel room in accordance with Detective Guillermo's request; however, the prosecution did not establish that the Hauanios gave Kelly's mother permission to enter their house with Detective Guillermo.[2]

Without the Hauanios' permission, Kelly's mother volunteered to take Detective Guillermo to the Hauanios' house herself so that he could continue the criminal investigation. Kelly's mother and a friend proceeded to the Hauanios' house where they met with Detective Guillermo; the three then entered the house through the closed but unlocked side door. Shortly thereafter, Detective Guillermo began taking photographs inside the house. In the process of doing this, he confiscated a cellophane container filled with cocaine that he found on the floor of the master bedroom.

Two days later, on Monday, November 9, 1992, Detective Guillermo attended an officers' briefing at the South Hilo Police Station. At the briefing, he summarized the robbery incident at the Hauanios' house, including his discovery of the cocaine in the master bedroom. Based on this information, Officer Derrick Diego was assigned to obtain a warrant to search the Hauanios' house. Accordingly, using nothing but the information he gleaned from the meeting about Detective Guillermo's discovery of the cocaine in the Hauanios' house, Officer Diego submitted a search warrant affidavit to a district court judge. The judge then issued a search warrant.

The police executed the warrant on the Hauanios' house. Sergeant Magnani, who was still investigating the October cocaine delivery and related conspiracy, *see supra,* was assigned to the search warrant team.[3] During the search, evidence was found linking the Hauanios to the cocaine delivery on Kala Street in October. *See supra.* Because of this, Sergeant Magnani telephoned his superior, Lieutenant Chai, and informed him that the Hauanios may have been connected to his drug-related conspiracy investigation. Lieutenant Chai then informed Sergeant Magnani that the Hauanios were already in custody and directed him to return to the station to question them.

The Hauanios had originally come to the station at approximately 3:00 p.m. to retrieve their truck.[4] Upon arriving at the station, the Hauanios were separated by Detective Guillermo, who then proceeded to interview Daniel about the robbery. Detective Guillermo did not inform Daniel of his *Miranda* rights prior to the interview. When Detective Guillermo questioned Daniel about the drugs he had found in the master bedroom, Daniel replied that he wanted to think about it before responding. Detective Guillermo honored this request and did not question him further about the drugs. After about an hour, Kelly entered the room and requested that the interview be continued to another time so that she and her husband could pick up their children. Detective Guillermo denied Kelly's request and arrested both the Hauanios at approximately 4:00 p.m. for the cocaine that he had seized from their house on Saturday, November 7, 1992.[5]

After processing, Kelly telephoned an attorney and was advised not to make any

---

1. Apparently, Detective Guillermo was concerned about the trauma that the Hauanios had experienced as a result of the robbery and thought it would be better if a family member asked for permission for the police to enter their house.

2. Finding of Fact (FOF) 13 provides in relevant part: "[T]he [prosecution] did not establish that the Hauanios had given [Kelly's mother] authority to consent to the search of their house." The prosecution does not challenge this finding.

3. Sergeant Magnani had been present at the briefing when Detective Guillermo reported the robbery incident and discovery of the cocaine in the Hauanios' house.

4. Detective Guillermo had telephoned the Hauanios earlier that day at their hotel to inform them that they could come to the station and pick up their truck, which apparently the police had recovered.

5. At this point, neither of the Hauanios had been advised of their *Miranda* rights.

statements unless he was present. Kelly informed Detective Guillermo that she had spoken with an attorney who had advised both her and her husband not to make any statements unless he was present. Detective Guillermo was aware that the Hauanios had retained counsel and that their counsel had advised them not to make any further statements.[6] Detective Guillermo did not question either of the Hauanios after this point. Kelly then informed Daniel that their attorney had advised them not to make any further statements and Daniel approved.[7] There is some dispute as to whether *both* of the Hauanios actually "invoked" their right to have counsel present. The circuit court found that the "Hauanios" actually invoked this right. *See* FOF 26.[8] Although the prosecution does not challenge this finding with respect to Kelly, the prosecution claims that FOF 26 is clearly erroneous as it relates to Daniel.[9] According to the prosecution, Daniel never "personally" invoked his right to counsel.

In any event, sometime in the early evening, Sergeant Magnani, who had earlier been directed by his supervisor to return to the station to interrogate the Hauanios, arrived. Not aware that the Hauanios had retained counsel or that their counsel had advised them not to make any statements, Sergeant Magnani separately advised the Hauanios of their *Miranda* rights. This was the first time either of the Hauanios had been advised of any rights since their arrival at the station. There is some dispute as to exactly what transpired next, but eventually both of the Hauanios made inculpatory statements to Sergeant Magnani. The Hauanios also executed consent forms authorizing the police to search the hotel room in which they had been staying since the robbery. The search of the hotel room resulted in contraband and other evidence being confiscated by the police.

On March 12, 1993, the Hauanios were indicted for the crimes of: (1) Conspiracy to Promote a Dangerous Drug in the First Degree, in violation of Hawai'i Revised Statutes (HRS) §§ 705–520 [10] and 712–1241; [11] (2) Promoting a Dangerous Drug in the Third Degree, in violation of HRS § 712–1243; [12] and (3) Promoting a Dangerous Drug in the First Degree, in violation of HRS § 712–1241(1)(a)(i).[13] In addition, the Hauanios' property was subject to forfeiture as a result of the crimes for which they were indicted.[14]

6. Detective Guillermo subsequently informed Lieutenant Chai that: (1) the Hauanios had communicated with an attorney; (2) they had been advised by that attorney not to make any statements; and (3) they expressed a desire to follow the attorney's advice.

7. According to Kelly, Detective Guillermo was present when she informed Daniel of their attorney's advice.

8. FOF 26 provides in relevant part: "Guillermo honored [the] *Hauanios' invocation of their right to counsel.*" (Emphasis added.)

9. The prosecution does not challenge any other of the trial court's FOFs.

10. HRS § 705–520 (1985) provides:

**Criminal conspiracy.** A person is guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a crime:
(1) He agrees with one or more persons that they or one or more of them will engage in or solicit the conduct or will cause or solicit the result specified by the definition of the offense; and

(2) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

11. HRS § 712–1241 (1992) provides in relevant part:

**Promoting a dangerous drug in the first degree.**
(1) A Person commits the offense of promoting a dangerous drug in the first degree if the person knowingly:
(a) Possesses one or more preparations, compounds, mixtures, or substances of an aggregate weight of:
(i) One ounce or more, containing methamphetamine, heroin, morphine, or cocaine or any of their respective salts, isomers, and salts of isomers[.]

12. HRS § 712–1243 (1985) provides in relevant part that "[a] person commits the offense of promoting a dangerous drug in the third degree if he knowingly possesses any dangerous drug in any amount."

13. *See supra* note 11.

14. *See* HRS §§ 712A–4(a)(b)(c)(d) and 712A–5(1)(e) and (f).

On March 19, 1993, Daniel and Kelly Hauanio moved for an order to suppress evidence seized by the police from their home and hotel room, including statements made while in custody, and for the return of all non-contraband property. On April 26, 27, 28, and May 10–11, 1993, evidentiary hearings were held before the circuit court on the Hauanios' motions. After considering the evidence, the circuit court, on June 16, 1993, granted the motions to suppress and for the return of all non-contraband property. In granting the Hauanios' motions to suppress, the circuit court issued the following conclusions of law (COLs):

1. The court has jurisdiction over the parties and issues before the court.

2. The entry of Guillermo into the Hauanios' house, although part of the continuing criminal investigation of the robbery, was a … search as the Hauanios had an actual and reasonable expectation of privacy in their home by the time Guillermo entered the home to take the photographs;

3. The State of Hawai['i] has not established that Kelly granted [her mother] the authority to consent to the entry by Guillermo;

4. The entry by Guillermo was an entry without consent; was an entry without a search warrant; and was not so close in time to the initial robbery investigation that he could enter the scene of the robbery to conduct further criminal investigation without a consent or a search warrant; therefore, the evidence recovered by him from the Hauanio house is suppressed;

5. The evidence subsequently obtained as a result of Guillermo's search is suppressed:

 a. The search warrant obtained by Diego is set aside and the evidence recovered from the execution of the warrant is suppressed inasmuch as the basis of the search warrant was the information provided by Guillermo about his recovery of the cocaine from the Hauanios' master bedroom;

 b. The statements and the evidence recovered as a result of the custodial interrogation and search of the hotel room are suppressed as "fruits" of the Guillermo search of the house;

6. The custodial interrogations of the Hauanios were conducted subsequent to them obtaining counsel and informing the police of counsel's advice that they were not to make any statements; [and]

7. The Hauanios['] informing Guillermo of the invocation of their right to counsel and not to answer any custodial interrogations is imputed to Magnani; therefore, the statements in issue made by the Hauanios and the consents to search their hotel room were not made voluntarily; thus, the statements of the Hauanios in issue are suppressed and the evidence recovered from the search of the hotel room is suppressed.

This timely appeal followed. On appeal, the prosecution challenges COLs 2, 4, 5(a) and (b), and 7.[15]

## II. *STANDARDS OF REVIEW*

■ We review the trial court's COLs *de novo* under the right/wrong standard. *State v. Bowe*, 77 Hawai'i 51, 53, 881 P.2d 538, 540 (1994) (citing *State v. Furutani*, 76 Hawai'i 172, 180, 873 P.2d 51, 59 (1994)). "Under the right/wrong standard, we examine the facts and answer the question without being required to give any weight to the trial court's answer to it." *State v. Miller*, 4 Haw.App. 603, 606, 671 P.2d 1037, 1040 (1983). *See also Amfac, Inc. v. Waikiki Beachcomber Inv. Co.*, 74 Haw. 85, 119, 839 P.2d 10, 28, *reconsideration denied*, 74 Haw. 650, 843 P.2d 144 (1992). Thus, "[a] COL is not binding upon the appellate court and is freely reviewable for its correctness." *Bowe*, 77 Hawai'i at 53, 881 P.2d at 540 (citation omitted).

■ We review the trial court's FOFs under the clearly erroneous standard. *Dan v. State*, 76 Hawai'i 423, 428, 879 P.2d 528, 533 (1994). Under this standard, "[a] finding of fact is clearly erroneous when, despite evidence to support the finding, the appellate

15. As discussed *supra,* the prosecution also challenges FOF 26.

court is left with the definite and firm conviction in reviewing the entire evidence that a mistake has been committed." *Id.*

## III. *DISCUSSION*

### A. *Detective Guillermo's Entrance Into The Hauanios' House*

The right of the people to be free from unreasonable searches and seizures is firmly embedded in both the Fourth Amendment to the United States Constitution [16] and article I, section 7 of the Hawai'i Constitution.[17] *State v. Pau'u,* 72 Haw. 505, 509, 824 P.2d 833, 835 (1992). Determining whether a particular governmental activity violates this right involves answering a two-step inquiry: (1) was the governmental activity in question a "search" in the constitutional sense; and, if so, (2) was it a "reasonable" search. *See State v. Kaaheena,* 59 Haw. 23, 28, 575 P.2d 462, 466 (1974).

The prosecution contends that Detective Guillermo's initial entrance into the Hauanios' house was justified under both the United States and the Hawai'i Constitutions. The prosecution asserts two arguments to support this contention. First, the prosecution argues that because Detective Guillermo entered the Hauanios' house for a limited purpose and as part of an ongoing criminal investigation—an investigation that the Hauanios voluntarily initiated by calling the police—the Hauanios had a diminished expectation of privacy. The prosecution therefore argues that Detective Guillermo's entrance was not a "search" within the meaning of the Fourth Amendment to the United States Constitution and/or article I, section 7 of the Hawai'i Constitution. Second, the prosecution argues that, even if Detective Guillermo's entry was a "search," it was conducted pursuant to a valid consent and was therefore reasonable.

### 1. *Detective Guillermo's entrance was a search.*

Before we address the reasonableness of a given governmental activity, we first must determine whether the activity in question amounts to a "search" in the constitutional sense. *United States v. Sharpe,* 470 U.S. 675, 682, 105 S.Ct. 1568, 1573, 84 L.Ed.2d 605 (1985); *Kaaheena,* 59 Haw. at 28, 575 P.2d at 466. In making this determination, we focus on the privacy expectations of the individual whose person or property is being examined. *Kaaheena,* 59 Haw. at 28, 575 P.2d at 466. Indeed, the primary purpose of both the Fourth Amendment and article I, section 7 "is to safeguard the privacy and security of individuals against arbitrary invasions by government officials." *State v. Bonnell,* 75 Haw. 124, 136, 856 P.2d 1265, 1272 (1993) (quoting *Camara v. Municipal Court,* 387 U.S. 523, 528, 87 S.Ct. 1727, 1730, 18 L.Ed.2d 930 (1967)). In ascertaining whether an individual's expectation of privacy brings the governmental activity at issue into the scope of constitutional protection, this court utilizes the following two-prong test, borrowed from Justice Harlan's concurring opinion in *Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516, 19 L.Ed.2d 576 (1967): "First, one must exhibit

---

**16.** The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment applies to the states through the Fourteenth Amendment to the United States Constitution. *Mapp v. Ohio,* 367 U.S. 643, 660, 81 S.Ct. 1684, 1694, 6 L.Ed.2d 1081 (1961).

**17.** Article I, section 7 of the Hawai'i Constitution provides:

> The right of the people to be secured in their persons, houses, papers and effects against unreasonable searches, and seizures *and invasions of privacy* shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

Haw. Const. art. I, § 7 (emphasis added). "The words 'invasions of privacy' were added to article I, section 7 by the 1968 Constitutional Convention." *State v. Quino,* 74 Haw. 161, 177 n. 1, 840 P.2d 358, 365 n. 1 (1992) (Levinson J., concurring) (citing *State v. Roy,* 54 Haw. 513, 518, 510 P.2d 1066, 1069 (1973)).

an actual, subjective expectation of privacy. Second, that expectation must be one that society would recognize as objectively reasonable." *Bonnell*, 75 Haw. 124, 139, 856 P.2d 1265, 1274 (1993) (citations and internal quotations omitted).

There is no question that a person generally has an actual, subjective expectation of privacy in his or her home. Nor is there any question that the expectation of privacy in one's home is one that society recognizes as objectively reasonable. *See United States v. United States District Court, Eastern District of Michigan*, 407 U.S. 297, 313, 92 S.Ct. 2125, 2134, 32 L.Ed.2d 752 (1972) ("[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed."). The prosecution concedes as much;[18] however, the prosecution contends that, because Detective Guillermo's entrance into the Hauanios' home was for a limited purpose, *i.e.*, taking photographs, and pursuant to an ongoing criminal investigation—an investigation that the Hauanios voluntarily initiated by calling the police—the Hauanios' expectation of privacy in their house on the day in question was diminished. We disagree.

The prosecution's argument seems to suggest that for some indefinite period of time the police could return to the Hauanios' home, reenter it without the Hauanios' permission, and take photographs with impunity, all in the name of the Hauanios' "diminished expectation of privacy." This argument is without merit. By calling the police to report a robbery sometime around midnight on Friday, November 6, 1992, the Hauanios did not somehow voluntarily give Hawai'i law enforcement officials an implied license to enter their house, including their master bedroom, to take pictures and search for evidence relating to the criminal investigation while they were at a hotel.

When the police initially entered the Hauanios' home to investigate the robbery that had just taken place, they did so with the Hauanios' permission. Thus, during the course of this initial investigation, the Hauanios' expectation of privacy in their home was, as the prosecution contends, "diminished." However, that permission terminated when the police and the Hauanios closed the doors and left the Hauanios' residence. As soon as this occurred, the Hauanios' expectation of privacy in their home was completely restored.

Indeed, after the police finished their initial investigation, Kelly informed them that she and Daniel were afraid to remain at their home and that her mother, who was present at the time, would know how to contact them. When the Hauanios gave the police the information necessary to contact them, it is reasonable to infer that they expected to be contacted if the police intended to reenter their home. The Hauanios and the police left the Hauanios' residence between 2:00 a.m. and 3:00 a.m. on Saturday, November 7, 1992. Before everyone left the premises, the front door, which had been damaged when the robbers first broke in, was barricaded shut and the door on the side of the house, which could not be locked, was closed. These actions are indicative of the Hauanios' intent not to allow uninvited persons to enter their home while they were at the hotel. We therefore reject the prosecution's argument and hold that Detective Guillermo's entrance into the Hauanios' home, whatever the purpose, over six hours after everyone had left was a "search" in the constitutional sense.

### 2. The search was not reasonable.

Determining whether a search is reasonable depends primarily on whether prior judicial approval has been obtained. It is well-established that a search by law enforcement officials without a judicial warrant issued upon probable cause is "presumptively unreasonable" under both the United States and Hawai'i Constitutions. *Katz*, 389 U.S. at 357, 88 S.Ct. at 514; *State v. Paahana*, 66 Haw. 499, 504, 666 P.2d 592, 596 (1983). Indeed, such searches are invalid unless they fall within one of the narrowly drawn exceptions to the warrant requirement. *State v.*

---

**18.** In its opening brief, the prosecution states: "Without dispute, [the Hauanios] retained an actual and subjective expectation of privacy in their home; and that expectation of privacy is one that society recognizes." Opening Brief at 15.

*Mahone,* 67 Haw. 644, 646, 701 P.2d 171, 173 (1985). In this case, there is no question that Detective Guillermo did not obtain a search warrant prior to entering the Hauanios' home. Thus, "the [prosecution] has the burden of overcoming [the] initial presumption of unreasonableness by proving that the search falls within one of the well-recognized and narrowly-defined exceptions to the general warrant requirements[.]" *Paahana,* 66 Haw. at 504, 666 P.2d at 596 (citing *Chimel v. California,* 395 U.S. 752, 762, 89 S.Ct. 2034, 2039–40, 23 L.Ed.2d 685 (1969)).

■ A search conducted pursuant to a voluntary and uncoerced consent by the person whose property is being searched is one such exception to the warrant requirement. *Mahone,* 67 Haw. at 646, 701 P.2d at 173. The prosecution contends that the consent exception to the warrant requirement applies in this case. Thus, the prosecution challenges the portion of COL 4 that provides: "The entry by Guillermo was an entry without consent[.]" In making this challenge, the prosecution does not claim that Detective Guillermo obtained the necessary consent from the Hauanios via the telephone conversation between Kelly and her mother. Rather, the prosecution's argument hinges upon whether Kelly's mother had authority to consent to a search of the Hauanios' home. In addition, the prosecution concedes that Kelly's mother did not have "actual" authority to consent to Detective Guillermo's entrance into the Hauanios' house; instead, the prosecution argues that she had "apparent authority."

### a. Illinois v. Rodriguez

The doctrine of "apparent authority" was adopted by the United States Supreme Court in *Illinois v. Rodriguez,* 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990). In *Rodriguez,* the Court faced the issue: "Whether a warrantless entry is valid when based upon the consent of a third party whom the police, at the time of entry, reasonably believe to possess common authority over the premises, but who in fact does not [possess such au-

thority.]" *Id.* at 179, 110 S.Ct. at 2796. In a divided opinion, written by Justice Scalia, the Court held that such an entry is valid.[19]

The relevant facts of *Rodriguez* can be summarized as follows: On July 26, 1985, the police were called to a residence in Chicago where they were met by a woman named Gail Fischer. *Id.* Fischer, who showed signs of a severe beating, informed the officers that she had been assaulted earlier that day by a man named Edward Rodriguez in an apartment. *Id.* She stated that Rodriguez was asleep in the apartment. *Id.* She then agreed to travel to the apartment with the police and unlock the door with "her" key so that the officers could enter and arrest him. *Id.*[20] During her conversation with the police, Fischer referred to the apartment in question as "our" apartment several times. *Id.* She also stated that she had clothes and furniture at the apartment. *Id.*

Accompanied by Fischer, the police officers drove to the apartment. *Id.* at 180, 110 S.Ct. at 2797. They did not obtain an arrest warrant for Rodriguez, nor did they seek a search warrant for the apartment. *Id.* At the apartment, Fischer unlocked the door with her key and gave the officers permission to enter. *Id.* Once inside, the officers observed in plain view drug paraphernalia and containers filled with white powder. *Id.* They proceeded to the bedroom where they found Rodriguez asleep and saw additional containers of white powder in two open attaché cases. *Id.* The officers arrested Rodriguez and seized the drugs and related paraphernalia. *Id.*

Rodriguez was charged with possession of a controlled substance with intent to deliver. *Id.* At trial, he moved to suppress the evidence seized at the time of his arrest. *Id.* In support of his motion, he claimed that Fischer had vacated the apartment several weeks earlier and lacked the authority necessary to consent to the entry. *Id.* The trial court granted Rodriguez's motion, holding that at the time Fischer consented to the officers' entry, she did not have "common authority"

---

**19.** Justice Marshall, joined by Justices Brennan and Stevens, dissented.

**20.** At trial, Fischer testified that she had taken the key without Rodriguez's knowledge. *Rodriguez,* 497 U.S. at 181, 110 S.Ct. at 2797–98.

over the apartment. *Id.*[21] The court rejected the prosecution's contention that, "even if Fischer did not possess common authority over the premises, there was no Fourth Amendment violation if the police *reasonably believed* at the time of their entry that she possessed the authority to consent." *Id.* (emphasis in original). The Appellate Court of Illinois affirmed the trial court's decision in all respects. The State of Illinois petitioned for leave to appeal and the Illinois Supreme Court denied the State's petition. *Id.* at 180–81, 110 S.Ct. at 2797–98 (citing 125 Ill.2d 572, 130 Ill.Dec. 487, 537 N.E.2d 816 (1989)). The United States Supreme Court subsequently granted certiorari. *Id.* at 181, 110 S.Ct. at 2797–98 (citing 493 U.S. 932, 110 S.Ct. 320, 107 L.Ed.2d 311 (1989)).

The *Rodriguez* majority began by explaining that the Fourth Amendment's general prohibition of warrantless entries into a person's home does not apply in instances where voluntary consent has been obtained either from the person whose property is being searched or from a third party who possesses "common authority" over the premises. *Id.* (citations omitted).[22] Moreover, the burden of establishing the existence of common authority rests upon the State. *Id.* The majority then agreed with the lower courts that the State of Illinois had not met its burden of establishing that Fisher possessed "common authority" over Rodriguez's apartment. *Id.*

However, the majority rejected Rodriguez's argument that the Fourth Amendment requires government officials to be factually correct when they make the determination of whether an individual actually possesses the authority necessary to consent to a search. The majority then explained what it called the "general rule" with respect to what is necessary to satisfy the "reasonableness" requirement of the Fourth Amendment:

It is apparent that in order to satisfy the 'reasonableness' requirement of the Fourth Amendment, what is generally demanded of the many factual determinations that must regularly be made by agents of the government—whether the magistrate issuing a warrant, the police officer executing a warrant, or the police officer conducting a search or seizure under one of the exceptions to the warrant requirement—is not that they always be correct, but that they always be reasonable.

*Id.* at 185, 110 S.Ct. at 2800. The *Rodriguez* majority further explained that "[b]ecause many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part. But the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability." *Id.* at 186, 110 S.Ct. at 2800 (quoting *Brinegar v. United States*, 338 U.S. 160, 176, 69 S.Ct. 1302, 1311, 93 L.Ed. 1879 (1949)).

The majority then stated that it "saw no reason to depart from this general rule with respect to facts bearing upon the authority to consent of a search." *Id.* Accordingly, the majority announced the following test for determining the constitutional validity of a warrantless search pursuant to the consent exception to the warrant requirement:

[D]etermination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment ... warrant a man [or woman] of reasonable caution in the belief that the consenting party had authority over the premises? If not, then warrantless entry without further inquiry is unlawful unless authority actually exists. But if so, the search is valid.

**21.** The trial court based its holding on its finding that Fischer was not a "usual resident" but rather an "infrequent visitor" of the apartment and that: (1) her name was not on the lease; (2) she did not contribute any rent; (3) she was not allowed to invite others to the apartment on her own; (4) she did not have access to the apartment when Rodriguez was away; and (5) she had moved some of her belongings out of the

apartment. *Rodriguez*, 497 U.S. at 180, 110 S.Ct. at 2797.

**22.** According to the *Rodriguez* majority, " '[c]ommon authority' rests 'on mutual use of the property by persons generally having joint access or control for most purposes[.]' " *Rodriguez*, 497 U.S. at 181, 110 S.Ct. at 2797 (quoting *United States v. Matlock*, 415 U.S. 164, 171 n. 7, 94 S.Ct. 988, 993 n. 7, 39 L.Ed.2d 242 (1974)).

*Id.* at 188–89, 110 S.Ct. at 2801 (internal citations and quotations omitted). The majority then remanded the case for consideration of the question whether the officers reasonably believed that Fischer had the authority to consent to a search of Rodriguez's house. *Id.* at 189, 110 S.Ct. at 2801–02. Thus, emerged the doctrine of apparent authority on the federal level.

b. Hawai'i requires actual authority.

While the concept of apparent authority is well-recognized on the federal level, this court has always required a showing of "actual authority" to satisfy article I, section 7 of the Hawai'i Constitution. *See Mahone,* 67 Haw. at 647, 701 P.2d at 173–74 ("A third party cannot waive another's constitutional right to privacy unless authorized to do so. Thus, the consent of a third party cannot validate a warrantless search unless the third party possessed authority to consent."); *State v. Matias,* 51 Haw. 62, 67, 451 P.2d 257, 260 (1969) (holding that an individual's constitutional right to privacy cannot be waived by another unless he or she has authorized that other person to do so). To be sure, consent of a third party is only effective if "it is shown 'that permission to search was obtained from a third party who possessed common authority over or other sufficient relationship to the premises or effects sought to be inspected.'" *State v. Brighter,* 63 Haw. 95, 99 n. 3, 621 P.2d 374, 378 n. 3 (1980) (citations omitted).

In this appeal, it is undisputed that Kelly's mother did not possess actual authority to consent to the search of the Hauanios' home. Acknowledging our tradition of requiring actual authority, the prosecution nevertheless urges this court to adopt the federal concept of apparent authority. For the reasons set forth below, we decline to do so.

As the ultimate judicial tribunal in the state, this court possesses the final and unreviewable authority to interpret and enforce the Hawai'i Constitution. *Bonnell,* 75 Haw. at 136, 856 P.2d at 1272 (quoting *State v. Quino,* 74 Haw. 161, 177, 840 P.2d 358, 365 (1992) (Levinson J., concurring), *cert. denied,* — U.S. —, 113 S.Ct. 1849, 123 L.Ed.2d 472 (1993)). In exercising this authority, it is well-established that as long as we afford defendants the minimum protection required by the federal constitution, we are free to provide broader protection under our state constitution. *Quino,* 74 Haw. at 170, 840 P.2d at 362 (citing *State v. Texeira,* 50 Haw. 138, 142 n. 2, 433 P.2d 593, 597 n. 2 (1967)); *see also State v. Bowe,* 77 Hawai'i 51, 57, 881 P.2d 538, 544 (1994) (emphasizing that "'[w]hen the United States Supreme Court's interpretation of a provision present in both the United States and Hawai'i Constitutions does not adequately preserve the rights and interests sought to be protected, we will not hesitate to recognize the appropriate protection as a matter of state constitutional law.'").

In the area of searches and seizures under article I, section 7, we have often exercised this freedom. *See, e.g., Quino,* 74 Haw. at 170, 840 P.2d at 362 (declining to adopt the definition of seizure employed by the United States Supreme Court and, instead, choosing to afford greater protection to the citizens of Hawai'i); *State v. Kim,* 68 Haw. 286, 289–90, 711 P.2d 1291, 1293–94 (1985) (declining to adopt the federal standard and requiring police officers to have a "reasonable basis of specific articulable facts to believe a crime has been committed" before ordering a driver to get out of the car after a traffic stop); *State v. Tanaka,* 67 Haw. 658, 661–62, 701 P.2d 1274, 1276 (1985) (holding on independent state grounds that there is a reasonable expectation of privacy in trash bags and thus warrantless seizure of them violates article I, section 7, absent exigent circumstances); *State v. Fields,* 67 Haw. 268, 282, 686 P.2d 1379, 1390 (1984) (providing broader protection on the state level for probationers subject to warrantless searches); *State v. Kaluna,* 55 Haw. 361, 367–69, 520 P.2d 51, 57–58 (1974) (providing broader protection under article I, section 7, in the area of warrantless searches incident to a valid custodial arrest than is provided on the federal level).

Our willingness to afford greater protection of individual privacy rights than is provided on the federal level arises from "our view [that] the right to be free of 'unreasonable' searches and seizures under article I,

section 5 [23] of the Hawai['] i Constitution is enforceable by a rule of reason which *requires that governmental intrusions into the personal privacy of citizens of this State be no greater in intensity than absolutely necessary.*" *Kaluna*, 55 Haw. at 369, 520 P.2d at 58–59 (emphasis added). Thus, "each proffered justification for a warrantless search must meet the test of *necessity* inherent in the concept of reasonableness." *State v. Fields*, 67 Haw. 268, 282–83, 686 P.2d 1379, 1390 (1984) (emphasis added). At this point, we simply cannot say that it is "necessary" to allow third parties to consent to searches of an individual's personal and private belongings when they are devoid of any authority to do so. Our constitution guarantees more to the citizens of the State of Hawai'i.

▉ Moreover, unlike its federal counterpart, article I, section 7, specifically protects against "invasions of privacy." [24] Allowing warrantless searches of an individual's home without the consent of someone authorized to give it, absent any exigent circumstances, would fly in the face of this protection. Indeed, an invasion of privacy is no less of an "invasion" if the governmental officials are "reasonable" in their mistaken belief that the third party possesses the authority to consent. This is because, regardless of whether the police acted in good faith, the individual's "privacy" is still invaded when the police search his or her personal belongings without permission.

We further note that while the United States Supreme Court has unequivocally stated that the primary purpose of the exclusionary rule on the federal level is to deter illegal police conduct, *see, e.g., United States v. Leon*, 468 U.S. 897, 916, 104 S.Ct. 3405, 3417, 82 L.Ed.2d 677 (1984) ("[T]he exclusionary rule is designed to *deter* police misconduct[.]") (emphasis added); *United States v. Calandra*, 414 U.S. 338, 347, 94 S.Ct. 613, 619–20, 38 L.Ed.2d 561 (1974) ("[T]he [exclusionary] rule's prime purpose is to *deter* future unlawful police conduct[.]") (emphasis added); *Terry v. Ohio*, 392 U.S. 1,

12, 88 S.Ct. 1868, 1875, 20 L.Ed.2d 889 (1968) (stressing that the rule's "major thrust is a *deterrent* one") (emphasis added), this court has yet to fully explicate the purpose of the exclusionary rule as it applies to article I, section 7.

▉ Although we acknowledge that the Hawai'i exclusionary rule serves the valuable purpose of deterring governmental officials from circumventing the protections afforded by the Hawai'i Constitution, *see State v. Furuyama*, 64 Haw. 109, 122, 637 P.2d 1095, 1104 (1981), we now pronounce that an equally valuable purpose of the exclusionary rule under article I, section 7, is to protect the *privacy* rights of our citizens. This pronouncement is consistent with our past interpretations of article I, section 7, whether or not the interpretations were based on the added privacy protection afforded by our constitution. It is also consistent with our decision today.

We are not alone in departing from the federal rationale of the exclusionary rule. *See People v. Wood*, 201 Mich.App. 58, 505 N.W.2d 882, 886 (1993) ("The [exclusionary] rule has a dual purpose: (1) protection of the right to privacy, and (2) deterrence of police misconduct."); *State v. Rogers*, 314 Or. 114, 118, 836 P.2d 127, 129–30 (1992) ("[U]nlike the Fourth Amendment exclusionary rule which has been based on deterring police misconduct, exclusions under Article I, section 9 [of the Oregon Constitution], have been based on the personal right to be free of an unlawful search and seizure."); *State v. Davis*, 313 Or. 246, 253–54, 834 P.2d 1008, 1012–13 (1992) (holding that the exclusionary rule is based on personal rights theory and not deterrence); *Commonwealth v. Edmunds*, 526 Pa. 374, 586 A.2d 887, 896–99 (1991) (rejecting the federal "good faith" exception to the exclusionary rule and holding that the purpose of the exclusionary rule in Pennsylvania is to safeguard individual privacy rights).

**23.** We note that article I, section 5 of the 1968 Hawai'i Constitution became article I, section 7 after the 1978 Constitutional Convention. But the language remained unchanged.

**24.** *See supra* note 17.

We therefore hold that, in order for a consent to search to be valid under article I, section 7 of the Hawai'i Constitution, the individual consenting must actually possess the authority to do so. In so holding, we reject the prosecution's suggestion that we adopt the federal doctrine of apparent authority under the Hawai'i Constitution. Accordingly, because there is no question that Kelly's mother did not actually possess the authority to consent to Detective Guillermo's search of the Hauanios' house, we hold that Detective Guillermo's search of the Hauanios' house violated article I, section 7 of the Hawai'i Constitution.[25]

### B. *Inevitable Discovery Of Evidence Recovered From The Hauanios' Home*

The prosecution next contends that, based on the record before us, even if Detective Guillermo's entrance into the Hauanios' home constituted an unreasonable search in violation of the United States and/or Hawai'i Constitutions, the evidence recovered from the subsequent search of the Hauanios' home should not be suppressed because it would have been "inevitably discovered" by the police via lawful means. Thus, the prosecution claims that the trial court erred in issuing COL 5(a), which set aside the warrant to search the Hauanios' home and the evidence recovered from the search because "the basis of the search warrant was the information provided by [Detective] Guillermo about his recovery of the cocaine from the Hauanios' master bedroom[.]"

### 1. *The independent source exception*

We have stated that " '[a] subsequent search even under warrant based upon the evidence obtained in the former tainted search is also tainted.' " *Brighter*, 63 Haw. at 100, 621 P.2d at 379 (quoting *State v. Boynton*, 58 Haw. 530, 535, 574 P.2d 1330, 1334 (1978)). However, "the exclusionary rule does not preclude the use of evidence derived from knowledge of incriminating facts 'gained from an *independent source.*' " *Id.* at 100, 621 P.2d at 379 (quoting *Silverthorne Lumber Co. v. United States*, 251 U.S. 385, 392, 40 S.Ct. 182, 183, 64 L.Ed. 319 (1920)) (emphasis added). *See also Pau'u*, 72 Haw. at 512, 824 P.2d at 837 (holding that "the [prosecution] failed to meet its burden of showing that the taint of the prior illegal search had been dissipated or that there was an *independent source* which induced Pau'u to waive his constitutional rights."). Thus, "[w]here the independent information is gained prior to the illegal search, the resulting evidence is not suppressed." *Brighter*, 63 Haw. at 100, 621 P.2d at 379 (citing *Peterson v. United States*, 411 F.2d 1074, 1078–79 (8th Cir.) *cert. denied*, 396 U.S. 920, 90 S.Ct. 247, 24 L.Ed.2d 199 (1969)).

The foregoing case law illustrates that this court recognizes an "independent source" exception to the exclusionary rule. Under the independent source exception, a "search warrant is not constitutionally defective because it is based, in part, on illegally seized evidence where sufficient probable cause exists to issue the warrant without

---

**25.** As required by *Rodriguez, supra,* we expressly declare that our decision today with respect to the issue of consent "rests upon adequate and independent state grounds." *See Rodriguez*, 497 U.S. at 182, 110 S.Ct. at 2798 ("[W]hen a 'state court decision fairly appears . . . , to be interwoven with the federal law,' we require that it contain a 'plain statement that [it] rests upon adequate and independent state grounds[.]' ").

Although our decision on the consent issue is based on adequate and independent state constitutional grounds, we note that it is highly questionable that Kelly's mother possessed "apparent" authority under the federal standard. Detective Guillermo had no reasonable basis for believing that Kelly's mother had common authority over the Hauanios' house—a requirement under the federal rule. In fact, unlike the offi-

cers in *Rodriguez*, Detective Guillermo *knew* that Kelly's mother did not live with the Hauanios. Indeed, he had just been to her house. Moreover, at the suppression hearing, Detective Guillermo testified that he felt he ultimately needed permission from the Hauanios to enter their house, and his actions clearly support his testimony. In all likelihood, Detective Guillermo did *not* reasonably believe that Kelly's mother possessed the "common authority" necessary to consent to a search of the Hauanios' home. There is no other logical explanation as to why he felt the need to urge Kelly's mother to call Kelly and request her permission to enter the Hauanios' home. Thus, even if Hawai'i did adopt the doctrine of apparent authority under our state constitution, the prosecution's argument would nevertheless fail.

relying on the suppressed evidence." *Brighter*, 63 Haw. at 101, 621 P.2d at 379 (citation omitted). This is not the case, however, if the tainted information provided by the officer as a basis for obtaining the warrant is the *only* information submitted in the affidavit supporting the warrant. *See id.*

 In the instant case, the affidavit submitted by Officer Diego in support of the search warrant alleged no information other than that provided by Detective Guillermo at the officers briefing regarding mainly his observations made at the Hauanios' home when he entered without the Hauanios' consent. The affidavit provides in relevant part:

## OBSERVATIONS OF AFFIANT

That on November 9, 1992, your affiant received the following information from DETECTIVE STEVEN GUILLERMO of the Criminal Investigation Section of the Hawaii County Police Department.

That on November 7, 1992, GUILLERMO investigated a robbery reported at a residence located at 15–2802 Kala Street, in Hawaiian Shores Subdivision, Puna, Hawai[']i. That the robbery had occurred at the residence whereupon three (3) unidentified males entered the victims' residence and held the victims at gun point and demanded money. After obtaining approximately $1,000.00 in U.S. Currency, the suspects fled the scene utilizing the victims' vehicle. Said vehicle was subsequently located at the bottom of Kahakai Boulevard.

That the victims/occupants of the residence are identified as DANIEL and KELLY HAUNIO [sic].

That on November 7, 1992, at about 0927 Hours, with the permission of KELLY HAUNIO's [sic] mother, PATRICIA COOPER, GUILLERMO made a check of the residence for evidence connected to the robbery investigation. During this time, he had located a cellophane package containing what appeared to be rock-like substance or "crack" cocaine. That the rock-like substance was located upon the floor of the master bedroom laying next to the bed. That the aggregate weight of the rock-like substance had been 3.5 grams.

According to GUILLERMO, at the time of the recovery of the rock-like substance, Cooper was present in the bedroom. Further that the victims had checked into a Hilo hotel since the robbery incident.

The affidavit also discussed, *inter alia,* the laboratory test results of the "rock-like substance," which was found to be cocaine, as well as a detailed description of the Hauanios' home. Additionally, it discussed Officer Diego's experience as a police officer and what he had learned about the benefits of searching a premises after cocaine and cocaine paraphernalia have been found. However, it did not allege any other information, independent of Detective Guillermo's illegal search, to support the warrant. Thus, the "independent source" exception does not apply.

### 2. *Nix v. Williams and the inevitable discovery exception*

While this court has utilized the independent source exception in determining whether to validate otherwise unconstitutional searches, we have not yet decided whether to adopt the "inevitable discovery" exception to the exclusionary rule. The inevitable discovery exception is, in a sense, a variation of the independent source exception, *see* Wayne R. LaFave & Jerold H. Israel, *Criminal Procedure* § 9.3(e) (2d ed. 1992), and was first adopted by the United States Supreme Court in *Nix v. Williams,* 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984).

In *Williams,* a ten-year-old girl disappeared from a YMCA building in Des Moines, Iowa, where she had been accompanied by her parents. *Id.* at 434, 104 S.Ct. at 2504. Shortly thereafter, a witness saw respondent Williams leaving the YMCA carrying a large bundle wrapped in an army blanket. *Id.* The next day, Williams' car was found in Davenport, Iowa. *Id.* Several items of clothing belonging to the missing child along with some of Williams' clothing and an army blanket were also found at a rest stop somewhere between Des Moines and Davenport. *Id.* Subsequently, a warrant was issued for the arrest of Williams. *Id.* at 435, 104 S.Ct. at 2504–05. Because the

Iowa police suspected the missing girl's body to be located somewhere between Des Moines and the rest stop where the clothing and blanket were found, they initiated a large-scale search with over two hundred volunteers for the body. *Id.*

Meanwhile, Williams surrendered to the local police in Davenport. *Id.* Des Moines police informed Williams' attorney that they would go to Davenport and return him to Des Moines without questioning him. *Id.* Two Des Moines detectives then went to Davenport, took Williams into custody, and proceeded to drive him back to Des Moines. *Id.* During the drive, one of the detectives began a conversation with Williams by saying:

> 'I want to give you something to think about while we're traveling down the road.... They are predicting several inches of snow for tonight, and I feel that you yourself are the only person that knows where this little girl's body is ... and if you get a snow on top of it you yourself may be unable to find it. And since we will be going right past the area [where the body is] on the way into Des Moines, I feel that we could stop and locate the body, that the parents of this little girl should be entitled to a Christian burial for the little girl who was snatched away from them on Christmas [E]ve and murdered.... [A]fter a snow storm [we may not be] able to find it at all.'

*Id.* at 435–36, 104 S.Ct. at 2505 (brackets in original). The detective told Williams not to answer and to just "think about it[.]" *Id.* at 436, 104 S.Ct. at 2505.

Sometime thereafter, Williams asked the detective whether the police had found the young girl's shoes. *Id.* After the detective replied that he was not sure, Williams directed the police to a point near a service station where he said he had left them; the shoes were not found. *Id.* Williams then directed the police to the child's body and the search was called off. *Id.* At the time, one of the search teams was only two and one-half miles from the area where the body was located—a location within the area to be searched. *Id.*

#### a. First trial

Williams was indicted for first-degree murder. At trial his attorney moved to suppress the evidence of the girl's body and all related evidence. *Id.* The trial court denied the motion, and a jury found him guilty as charged. *Id.* at 437, 104 S.Ct. at 2505–06. Williams then sought habeas corpus relief in the United States District Court for the Southern District of Iowa. *Id.* The district court concluded that the evidence relating to the body had been wrongly admitted at trial and the United States Court of Appeals for the Eighth Circuit agreed. *Id.* The United States Supreme Court granted certiorari and affirmed, holding that the detective had obtained the incriminating statement from Williams by violating his right to counsel. *Id.* (citing *Brewer v. Williams*, 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977)). However, the Court noted that "evidence of the body's location and condition 'might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams.'" *Id.* (citing 430 U.S. at 407, n. 12, 97 S.Ct. at 1243, n. 12).

#### b. Second trial

At Williams' second trial, the court concluded that the State had proven by a preponderance of the evidence that, "if the search had not been suspended and Williams had not led the police to the victim, her body would have been discovered 'within a short time' in essentially the same condition as it was actually found." *Id.* at 437–38, 104 S.Ct. at 2506 (emphasis in original). The trial court also ruled that "if the police had not located the body, 'the search would clearly have been taken up again where it left off, given the extreme circumstances of this case and the body would [have] been found *in short order.*'" *Id.* at 438, 104 S.Ct. at 2506 (emphasis in original). Accordingly, the challenged evidence was again admitted. The jury found Williams guilty of first-degree murder and he was sentenced to life in prison. *Id.* The Iowa Supreme court affirmed.

In 1980, the United States District Court for the Southern District of Iowa again re-

viewed the case on a writ of habeas corpus. The court affirmed, finding that the body would have inevitably been found by the searchers. *Id.* at 439, 104 S.Ct. at 2506–07. However, the Eighth Circuit reversed. While the Eighth Circuit agreed that there is an inevitable discovery exception to the exclusionary rule, the court held that the exception requires proof that the police did not act in bad faith. Once again, the United States Supreme Court granted certiorari. *Id.* at 440, 104 S.Ct. at 2507.

### c. The Supreme Court's holding

Justice Burger, writing for the majority,[26] began the opinion by acknowledging the Court's past adherence to the "independent source" exception to the exclusionary rule. *Id.* at 441–42, 104 S.Ct. at 2507–08 (citing *Silverthorne Lumber Co. v. United States,* 251 U.S. 385, 40 S.Ct. 182, 64 L.Ed. 319 (1920) and *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963)).[27] The *Williams* majority justified its adherence to the independent source doctrine by stating, *inter alia,* that "[w]hen challenged evidence has an independent source, exclusion of such evidence would put the police in a *worse* position than they would have been in absent any error or violation." *Id.* at 443, 104 S.Ct. at 2509. (emphasis added). The majority then explained that the "exclusion of evidence that would inevitably have been discovered would also put the government in a *worse* position, because the police would have found the evidence if no misconduct had taken place." *Id.* at 444, 104 S.Ct. at 2509 (emphasis added). Thus, the majority ruled that while the independent source exception did not apply in the case before it, "its rationale is wholly consistent with and justifies our adoption of the ultimate or inevitable discovery exception to the exclusionary rule." *Id.*

Consequently, the *Williams* majority announced the following rule:

> If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means— here the volunteers' search—then the deterrence rationale has so little basis that the evidence should be received. Anything less would reject logic, experience, and common sense.

*Id.* (footnote omitted). The majority proceeded to stress the primary purpose of the exclusionary rule on the federal level, *i.e.,* deterrence.[28] Finally, after reviewing the evidence, the majority held that the young girl's body would inevitably have been discovered. *Id.* at 450, 104 S.Ct. at 2512.

### d. Brennan's dissent

Justice Brennan, joined by Justice Marshall, dissented from the majority. In his dissent, Justice Brennan began by agreeing that "the 'inevitable discovery' exception to the exclusionary rule is consistent with the requirements of the Constitution." *Id.* at 459, 104 S.Ct. at 2517. However, Justice Brennan opined that the majority overlooked the crucial distinction between the "inevitable discovery" exception and the "independent source" exception. *Id.*

> When properly applied, the 'independent source' exception allows the prosecution to use evidence only if it was, in fact, obtained by fully lawful means. It therefore does no violence to the constitutional protections that the exclusionary rule is meant to enforce. The 'inevitable discovery' exception is likewise compatible with the Constitution, though it differs in one key respect from its next of kin: specifically, the evidence sought to be introduced at trial has not actually been obtained from an independent source, but rather would have been discovered as a matter of course if

---

**26.** Justice Brennan, joined by Justice Marshall, wrote a dissenting opinion. *See* discussion *infra.* Also, Justice White and Justice Stevens filed separate concurring opinions.

**27.** In citing these cases, the Supreme Court also demonstrated that the Court has, in the past, negated the "good faith" requirement advanced

by the Eighth Circuit. *Id.* at 442, 104 S.Ct. at 2508.

**28.** The Court also rejected the Eighth Circuit's requirement that the prosecution demonstrate the absence of bad faith. *Id.* at 445–47, 104 S.Ct. at 2509–11.

independent investigations were allowed to proceed.

*Id.*

Thus, Justice Brennan pointed out that "[t]he inevitable discovery exception necessarily implicates a hypothetical finding that differs in kind from the factual finding that precedes application of the independent source rule." *Id.* Because of this distinction, Justice Brennan would have required the prosecution to satisfy a heightened burden of proof before allowing evidence to be admitted under the "inevitable discovery" exception to the exclusionary rule. *Id.* He explained:

> To ensure that this hypothetical finding is narrowly confined to circumstances that are functionally equivalent to an independent source, and to protect fully the fundamental rights served by the exclusionary rule, I would require clear and convincing evidence before concluding that the government had met its burden of proof on this issue. Increasing the burden of proof serves to impress the factfinder with the importance of the decision and thereby reduces the risk that illegally obtained evidence will be admitted.

*Id.* at 459–60, 104 S.Ct. at 2517 (emphasis added and internal citations omitted).

### 3. *Hawai'i now adopts the inevitable discovery exception*

 Because we believe that the inevitable discovery exception to the exclusionary rule is a sound principle, which prevents the setting aside of convictions that would have been obtained in the absence of police misconduct, we now adopt the federal concept of inevitable discovery on the state level. However, we also view the logic of Justice Brennan's dissent as compelling. We agree that application of the inevitable discovery excep-

tion necessarily requires speculation as to the outcome of hypothetical circumstances. And because the privacy rights of the citizens of the State of Hawai'i may turn upon the outcome of the hypothetical, it is incumbent upon us to assure that our speculation is as close to correct as possible. The added protection against governmental "invasions of privacy" in our constitution demands no less.[29] Thus, because we discern wisdom in Justice Brennan's dissenting opinion, and because we want to ensure that the added protection in the Hawai'i Constitution is not vitiated by a "bad guess," we require the prosecution to present clear and convincing evidence that any evidence obtained in violation of article I, section 7, would inevitably have been discovered by lawful means before such evidence may be admitted under the inevitable discovery exception to the exclusionary rule.[30] *See State v. Worthy,* 273 N.J.Super. 147, 156, 641 A.2d 282, 286–87 (1994) (requiring a showing of clear and convincing evidence as a precondition to admission of evidence under the inevitable discovery exception to the exclusionary rule).

In the present case, the trial court has not specifically ruled on whether the evidence in question would have been inevitably discovered. Nevertheless, the prosecution urges us to review the entire record and make an independent determination that the evidence recovered from the illegal search of the Hauanios' home would have been "inevitably discovered" lawfully pursuant to Sergeant Magnani's investigation. According to the prosecution, the record demonstrates that it was only a matter of time before Magnani would have obtained a search warrant to search the Hauanios' home.[31] The prosecution therefore contends that we should reverse the portion of the circuit court's order that set aside the warrant to search the

---

**29.** In addition, a higher burden of proof would assist in serving one of the main purposes of the exclusionary rule under article I, section 7, *i.e.,* safeguarding the privacy rights of our citizens against unlawful governmental intrusions. *See supra.*

**30.** We note that "[c]lear and convincing evidence means such evidence as will produce 'in the mind of a reasonable person a firm belief as to

the facts sought to be established.'" *Almeida v. Almeida,* 4 Haw.App. 513, 518, 669 P.2d 174, 179 (1983) (quoting *Welton v. Gallagher,* 2 Haw. App. 242, 246, 630 P.2d 1077, 1081 (1981), *aff'd,* 65 Haw. 528, 654 P.2d 1349 (1982)).

**31.** "Indeed, [the prosecution claims] Guillermo's investigation had very little, if any, impact on the course of Magnani's investigation."

Hauanios' home, as well as the evidence recovered from the search.

 We disagree. The record is simply devoid of evidence that would "produce 'in the mind of a reasonable person a firm belief as to the facts [the prosecution is seeking to establish.]' " [32] It is fundamental that no warrant may be issued absent a showing of probable cause. *Monick v. State*, 64 Haw. 399, 400, 641 P.2d 1341, 1342 (1982) (citing *State v. Kalai*, 56 Haw. 366, 537 P.2d 8 (1975)). A mere suspicion is not enough to demonstrate the existence of probable cause. Indeed, "[p]robable cause is said to exist when facts and circumstances within one's knowledge and of which one has reasonable trustworthy information are sufficient in themselves to warrant a person of reasonable caution to believe that an offense has been committed." *Id.* (citing *State v. Decano*, 60 Haw. 205, 588 P.2d 909 (1978)).

 According to the record, before Detective Guillermo informed Sergeant Magnani that he had recovered cocaine from the Hauanios' house on Kala Street, Sergeant Magnani had no information regarding any involvement of the Hauanios in drug activity. And, although he was "suspicious" that cocaine had been delivered to one of the four houses on Kala Street, he had taken no action to determine who occupied or owned any of the houses in question. Thus, on the record before us, there is no evidence to support an inference that Sergeant Magnani ever independently possessed the level of suspicion necessary to obtain a warrant to search the Hauanios' home. Even if he might have eventually acquired enough information to obtain a search warrant, however, the record lacks the clear and convincing evidence necessary to show that the evidence recovered from the Hauanios' home as a result of Detective Guillermo's illegal search, would have still been there. Accordingly, we hold that, based on the record before us, the prosecution has failed to meet its burden of proof that the evidence recovered from the Hauanios' home would have been inevitably

---

32. *See supra* note 30.

33. While the prosecution challenges the circuit court's COLs that the statements were made after the "Hauanios" invoked their right to counsel,

---

discovered lawfully pursuant to Sergeant Magnani's investigation.

## C. *The Statements Made During Daniel's Custodial Interrogation And The Evidence Recovered From The Subsequent Hotel Search*

### 1. *Inculpatory statements and waiver*

#### a. The statements made by the Hauanios were "fruits" of Detective Guillermo's illegal search.

 The circuit court concluded that the inculpatory statements, including the consents to search the hotel room, made by the Hauanios were "fruits" of Detective Guillermo's illegal search. *See* COL 5(b). Aside from (1) making a general claim that the court erred in issuing COL 5(b) and (2) contending that the statements would have been "inevitably discovered," *see* discussion *infra*, the prosecution does not present a single argument to support the contention that the circuit court's conclusion was erroneous.[33] Because of this, it is our prerogative to disregard the prosecution's claim without addressing it. *See Loui v. Board of Medical Examiners*, 78 Hawai'i 21, 29 n. 19, 889 P.2d 705, 713 n. 19 (1995) (citing *State v. Reed*, 77 Hawai'i 72, 86, 881 P.2d 1218, 1232 (1994)). Nevertheless, in the interest of justice, we address the prosecution's claim herein. For the reasons set forth below, we hold that the circuit court's COL 5(b) was not "wrong."

As discussed *supra*, the Fourth Amendment to the United States Constitution and article I, section 7 of the Hawai'i Constitution protect the right of the people to be free from unreasonable searches and seizures. *Pau'u*, 72 Haw. at 509, 824 P.2d at 835. In addition, the Fifth Amendment to the United States Constitution and article I, section 10 of the Hawai'i Constitution provide in relevant part that "[n]o person shall ... be compelled in any criminal case to be a witness against [oneself][.]" *Id.* "When a confession or other evidence is obtained in viola-

see COLs 6 and 7, this has nothing to do with whether the statements obtained were "fruits" of Detective Guillermo's illegal search.

tion of either of these rights, the prosecution will not be permitted to use it to secure a defendant's criminal conviction." *Id.* (citing *State v. Russo,* 67 Haw. 126, 681 P.2d 553 (1984)).

■ Thus, a waiver of one's constitutional rights or a confession, even if uncoerced and intelligently given, will be inadmissible if induced by a prior illegality. *See Pau'u,* 72 Haw. at 509, 824 P.2d at 835–36 (citing *State v. Knight,* 63 Haw. 90, 94, 621 P.2d 370, 374 (1980)). Indeed,

> when the defendant makes a showing that [the] waiver [or confession] was predicated upon an illegal search, the government's burden in rebutting the invalidity of the waiver [or confession] is to show that the waiver '[is not the result of an exploitation] of that illegality but instead by means sufficiently distinguishable to be purged of the primary taint.'

*Id.* at 510, 824 P.2d at 836 (citing *Wong Sun v. United States,* 371 U.S. 471, 488, 83 S.Ct. 407, 417–18, 9 L.Ed.2d 441 (1963) (internal brackets added) (quoting Maguire, Evidence of Guilt 221 (1959)).

In *Pau'u, supra,* we addressed the issue whether a defendant's confession and consent to search were admissible when made after the police conducted an illegal search and seizure of the defendant's belongings, and proceeded to show him the evidence recovered against him. The relevant facts of *Pau'u, see* 72 Haw. at 507–08, 824 P.2d at 834–35, are as follows: Several officers pulled the defendant, Folototo Pau'u, over by surrounding his car. Pau'u had been suspected of theft. In addition, the vehicle tax and safety check on his car had expired. The officers ordered Pau'u out of his car and arrested him. Because Pau'u's car was stopped in the middle of a busy street, one of the officers entered the car to move it. While in the car, the officer found a black bag with stolen credit cards inside. Shortly thereafter, at the arrest scene, one of the officers approached Pau'u with the credit cards and stated: "You've been a busy boy, haven't you." Later at the police station, after being informed of his *Miranda* rights, Pau'u consented to a search of his car, and confessed to the crimes.

At trial, Pau'u moved to suppress the evidence obtained from the search of his black bag and car, as well as evidence of his confession. The circuit court held that the police officer, who entered Pau'u's car to move it, had conducted an illegal search of the black bag. The prosecution did not challenge this holding. Accordingly, the circuit court suppressed the evidence of the credit cards found inside. The circuit court, however, concluded that Pau'u's consent to search and confession were (1) voluntarily given, and (2) free of any taint of the illegal warrantless search of the bag. Pau'u's statements and the evidence subsequently recovered were therefore admitted at trial. Pau'u was ultimately convicted.

On appeal, Pau'u conceded that his consent to search his car and his confession were voluntary to the extent that he understood his rights and was not coerced; however, he contended that the only reason he consented and confessed was that he felt he had no choice because the police already had the evidence to convict him when the credit cards were found in his bag. *Pau'u,* 72 Haw. at 510, 824 P.2d at 836. Because the search of the bag was illegal, and because Pau'u made a showing that his confession and waiver were predicated upon an illegal search, "[t]he [prosecution], therefore, had to demonstrate that the taint of the illegal search of the bag had been dissipated or that the waivers were induced by a source independent of the illegal search." *Id.* The prosecution attempted to meet this burden by arguing that,

> under the circumstances of Pau'u's arrest, namely that he was stopped by being surrounded by several police officers' cars, ordered to place his hands on the dashboard, then ordered out of the car, all of which occurred prior to the search of the black bag, *Pau'u must have known or believed that the police already had the evidence to convict him, and at this point Pau'u must have felt the futility of withholding any consent or confession.*

*Id.* at 511, 824 P.2d at 836 (emphasis added).

This court disagreed with the prosecution's argument, finding that "the [prosecution's] argument ... [was] not based on any evi-

dence but was merely *surmise and speculative inference.*" *Id.* at 512, 824 P.2d at 837 (emphasis added). We therefore held that "the [prosecution] ... failed to meet its burden of showing that the taint of the prior illegal search had been dissipated or that there was an independent source which induced Pau'u to waive his constitutional rights." *Id.* As such, we vacated Pau'u's convictions and remanded for a new trial.

■ The instant case is analogous to the *Pau'u* decision. In this case, as in *Pau'u*, an illegal search was conducted by the police. Also in this case, as in *Pau'u*, the evidence recovered as a result of that illegal search provided the basis for the defendants' arrest. *See* discussion of *Pau'u* facts *supra*, and unchallenged FOF 23 ("Guillermo ... arrested both the Hauanios at approximately 4:00 p.m. for the 'crack' cocaine that *he recovered from their house.*") (emphasis added). Finally, in both cases, at some point before making the statements, the defendants were questioned about the evidence recovered as a result of the illegal search. *See* discussion of *Pau'u* facts *supra*, and unchallenged FOF 21 ("When Guillermo inquired about the drugs, Daniel replied that he wanted to think about it before responding[.]"). Accordingly, as we did in *Pau'u*, we hold that the Hauanios were induced to make inculpatory statements and to consent to a search of their hotel room in violation of article I, sections 7 and 9 of the Hawai'i Constitution.[34]

#### b. Inevitable discovery of the statements and waiver

■ The prosecution next contends that the Hauanios were already the primary suspects in Sergeant Magnani's drug conspiracy investigation; thus, even if their statements and consents were tainted, "it was inevitable that Magnani would contact the Hauanios at his earliest possible opportunity, advise them of their rights, obtain voluntary statements from them, and request consent to search places they occupied or obtain search warrants for those premises." At this point, we fail to see how the prosecution could possibly present the clear and convincing evidence that would be necessary to support its contention. Indeed, absent some sort of supernatural ability, there is simply no way to predict that a particular individual would have "inevitably" legally made the same statements that he or she made as a result of an illegal interrogation.

■ Thus, because we believe that applying the "inevitable discovery" doctrine to oral statements, including confessions and consents to search, would amount to "surmise and speculative inference" *see Pau'u*, 72 Haw. at 512, 824 P.2d at 837, beyond that in which we are willing to engage at the expense of our constitution, we hold that it only applies to the admissibility of tangible physical evidence.[35] Accordingly, we hold that the circuit court did not err in suppressing the inculpatory statements of the Hauanios and the waivers of their rights to refuse consent to a search of the hotel room in which they were staying. We reach this holding on adequate and independent state grounds. *See Rodriguez*, 497 U.S. at 182, 110 S.Ct. at 2798; *supra* note 25.

#### 2. Evidence recovered from the Hauanios' hotel room

■ The circuit court suppressed the evidence recovered from the Hauanios' hotel

---

34. Because we find that the Hauanios were induced to make the statements in violation of their constitutional rights, there is no need for us to reach the issue whether these statements were obtained after they invoked their right to have counsel present during questioning. *See* FOFs 6 and 7.

35. Of course, the tangible evidence can, and often will, derive from statements made by the accused. *See, e.g., Nix*, 467 U.S. at 437, 104 S.Ct. at 2506 ("[A]lthough Williams' incriminating statements could not be introduced into evidence at a second trial, evidence of the body's location and condition 'might well be admissible on the theory that the body would have been discovered in any event....'") (quoting *Brewer v. Williams*, 430 U.S. at 406 n. 12, 97 S.Ct. at 1243 n. 12). Moreover, by holding that the inevitable discovery doctrine cannot be utilized by the prosecution to demonstrate that a defendant would have inevitably made a voluntary and intelligent statement, we are not holding that the "independent source" exception cannot be so utilized. *See Pau'u*, 72 Haw. at 512, 824 P.2d at 837 (holding that the prosecution failed to meet its burden of showing an "independent source" that induced defendant to confess or waive his constitutional rights).

room as "fruits" of prior constitutional violations. *See* COL 5(b). Because we held that the inculpatory statements and the consent were induced as a result of a prior illegal search, and because the search of the hotel room was a direct result of the statements and consent to search, we hold that the evidence recovered amounts to "fruits" of the prior illegality. The prosecution nonetheless contends that the evidence obtained from the hotel room as a result of the waivers would have inevitably been discovered in the course of Sergeant Magnani's investigation. Upon reviewing the record before us, we are unable to find any evidence to support the prosecution's contention. Accordingly, we disagree and hold that the prosecution has failed to meet its burden of demonstrating, through clear and convincing evidence, that the evidence recovered from the Hauanios' hotel room would have been inevitably discovered by Sergeant Magnani.

## IV. CONCLUSION

In summation, we hold that: (1) Detective Guillermo's initial entrance into the Hauanios' home was a "search" in the constitutional sense; (2) Detective Guillermo's search was unreasonable in violation of article I, section 7, of the Hawai'i Constitution; (3) the subsequent warrant to search the Hauanios' home and the evidence recovered from the search were obtained as a result of Detective Guillermo's illegal search, and as such, the evidence constitutes "fruit" of an illegal search; (4) based on the record before us, the prosecution has not met its burden of proving by clear and convincing evidence that the evidence recovered from the Hauanios' home would have been "inevitably" discovered pursuant to Sergeant Magnani's investigation; (5) the inculpatory statements and consent to search the hotel room given by the Hauanios were obtained as a result of evidence recovered in violation of article I, sections 7 and 9; (6) the evidence recovered from the hotel room was a direct result of the tainted statements and consents to search; thus, such evidence amounts to "fruit" of the tainted statements and consents; (7) based on the record before us, the prosecution has not met its burden of proving that the evidence recovered from the hotel room search would have

been "inevitably" discovered; and, finally, (8) our decision today is based on adequate and independent state constitutional grounds.

For the foregoing reasons, we affirm the circuit court's order granting the Hauanios' motion to suppress evidence and for the return of all non-contraband property to the Hauanios.