286 P.3d 809

**STATE of Hawai'i, Respondent/Plaintiff–Appellant,**

v.

**Marco RODRIGUES, Petitioner/Defendant–Appellee.**

**No. SCWC–30692.**

Supreme Court of Hawai'i.

Oct. 12, 2012.

As Corrected Oct. 26, 2012.

James S. Tabe and Craig W. Jerome, for petitioner.

Charles A. Foster, for respondent.

RECKTENWALD, C.J., NAKAYAMA, ACOBA, and McKENNA, JJ., and Circuit Judge TO'OTO'O, Assigned Due to Vacancy.

Opinion of the Court by ACOBA, J.

We hold that the circuit court of the fifth circuit (the court) properly suppressed the evidence obtained by Respondent/Plaintiff–Appellant State of Hawai'i (Respondent) during the unlawful search of Petitioner/Defendant–Appellee Marco Rodrigues (Petitioner) because Respondent failed to "present clear and convincing evidence that [the] evidence obtained in violation of article I, section 7 [of the Hawai'i Constitution],[1] would inevitably have been discovered by lawful means[,]" *State v. Lopez*, 78 Hawai'i 433, 451, 896 P.2d 889, 907 (1995). Hence the evidence was not admissible under the inevitable discovery exception to Hawai'i's exclusionary rule. We therefore vacate the April 3, 2012 judgment

---

1. Article I, section 7 of the Hawai'i Constitution provides as follows:

The right of the people to be secure in their persons, houses, papers and effects against unreasonable searches, seizures and invasions of privacy shall not be violated; and no warrants shall issue but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched and the persons or things to be seized or the communications sought to be intercepted.

of the Intermediate Court of Appeals (ICA) to the contrary, filed pursuant to its March 19, 2012 Amended Memorandum Opinion (mem. op.),[2] vacating and remanding the August 5, 2010 Findings of Facts, Conclusions of Law and Order Granting Defendant's Motion to Suppress Evidence filed by the court, and we remand to the court for further proceedings consistent with this opinion.

## I.

### A.

On November 23, 2008, Officer Scott Williamson (Officer Williamson or the officer) was at Hanamaulu Beach Park and saw Petitioner sleeping in a vehicle that had an expired safety sticker. Officer Williamson approached the vehicle and requested that Petitioner furnish his license and registration. Petitioner was unable to produce any identification but verbally identified himself. The officer learned from dispatch that Petitioner had three outstanding bench warrants for contempt of court so he placed Petitioner under arrest.

Officer Williamson apparently handcuffed petitioner, although it is not clear whether his hands were in front of or behind him.[3] The officer then searched Petitioner "from top to bottom" and "pulled [out Petitioner's] pockets from the outside looking for any weapons or means of escape, needles, razor blades, strong fishing line, ... [or] matches." When Officer Williamson pulled out Petitioner's left pocket, he discovered a plastic baggie containing methamphetamine (hereinafter, methamphetamine). Officer Williamson placed Petitioner under arrest and transported him to the cellblock at a Kaua'i Police Department (KPD) station. Prior to placing Petitioner in the cellblock, Officer Williamson conducted an inventory search of Petitioner.[4]

### B.

### 1.

■ On November 25, 2008, Petitioner was charged by complaint[5] with Promoting a Dangerous Drug in the Third Degree, Hawai'i Revised Statutes (HRS) § 712–1243.[6] Prior to trial, Petitioner filed a motion to suppress seeking to preclude Respondent from introducing the methamphetamine recovered from him into evidence. Petitioner argued that the methamphetamine could not be introduced because it was obtained during a warrantless search of his pockets, in violation of Article 1, section 7 of the Hawai'i Constitution and the Fourth[7] and Four-

---

2. The opinion was filed by Chief Judge Craig H. Nakamura, joined by the Honorable Alexa D.M. Fujise. The Honorable Lawrence M. Reifurth filed a dissenting opinion.

3. Although the court found that Petitioner was arrested and handcuffed, there was no testimony presented in this case supporting the court's finding in this respect. However, in the declaration attached to Petitioner's Motion to Suppress, Petitioner's counsel declared that Officer Williamson placed handcuffs on Petitioner after arresting him.

4. This court has described the parameters of an inventory search as follows:

> [T]he police have full authority to prohibit the entry of weapons, drugs or other potentially harmful items into jail. To this end, they may require internees to surrender any possible repositories for such items prior to incarceration. However, a concomitant of this wide authority to prohibit the entry of personal belongings which may harbor forbidden contents is a complete absence of authority to conduct a general exploratory search of the belongings themselves.

This absence of authority derives from the lack of any justification for such a further search inherent in the exception itself. Once the internee has turned over his [or her] possessions for safekeeping it is no longer possible that he [or she] may take them into jail.
State v. Kaluna, 55 Haw. 361, 373–74, 520 P.2d 51, 61 (1974) (footnote omitted).

5. The complaint was originally filed in the District Court of the Fifth Circuit. The case was committed from the district court to the court on December 1, 2008.

6. HRS § 712–1243 (Supp.2008) provides as follows:

> § 712–1243. Promoting a dangerous drug in the third degree. (1) A person commits the offense of promoting a dangerous drug in the third degree if the person knowingly possesses any dangerous drug in any amount.
> (2) Promoting a dangerous drug in the third degree is a class C felony.

7. The Fourth Amendment of the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against

teenth Amendments of the United States Constitution.[8]

Petitioner argued that the warrantless search and seizure was not justified as a search incident to lawful arrest because such a search " 'is limited in scope to a situation where it is reasonably necessary to discover the fruit or instrumentalities of the crime for which the defendant is arrested, or to protect the officer from attack, or to prevent the offender from escaping.' " (Quoting *State v. Enos*, 68 Haw. 509, 720 P.2d 1012 (1986).) (Emphasis omitted.) In addition, Petitioner maintained that the search was not necessary to protect Officer Williamson because the search occurred after he was handcuffed and the officer did not conduct a pat-down search of Petitioner's person. Thus, Petitioner urged that Officer Williamson would have had no reason to believe Petitioner was concealing any contraband.

In its memorandum in opposition to Petitioner's motion to suppress, Respondent asserted that regardless of the nature of the crime, "it is per se reasonable for the arresting officer to conduct a warrantless pat-down search of a limited nature prior [to] or after arrest and before transport." (Citing *State v. Reed*, 70 Haw. 107, 762 P.2d 803 (1988).) Such searches incident to lawful arrest, Respondent maintained, are intended to afford an arresting officer the opportunity to recover weapons or other means of escape, or other evidence that might be lost as a result of concealment or destruction. (Citing *State v. Paahana*, 66 Haw. 499, 666 P.2d 592 (1983).) Thus, Respondent urges that Officer Williamson's practice constituted a valid search incident to arrest.[9]

Alternatively, Respondent argued that the search was justified under the inevitable discovery exception to the exclusionary rule which provides that evidence recovered from an otherwise illegal search need not be suppressed "if the evidence would have been 'inevitably discovered' by the police via lawful means." (Citing *Lopez*, 78 Hawai'i at 433, 896 P.2d at 889.) Respondent maintained that because all arrestees are subjected to a pre-incarceration custodial search during which their pockets are checked for drugs and weapons, Petitioner's pockets would have been searched and the evidence discovered prior to Petitioner being placed in the cellblock.

2.

The court held a hearing on Petitioner's motion to suppress on March 3, 2009. At the hearing, Officer Williamson testified that he pulled Petitioner's pockets out from the outside "rather than just patting the outside of the pockets[,]" because "[i]f there [was] any kind of needle or sharp object in there, [he would] run the risk of cutting [his] hand through the clothing." He also related that prior to placing Petitioner in the cellblock, he conducted an inventory search which he explained "insure[s] that there is no contraband

unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

8. This court has held that a search and seizure incident to lawful arrest is an exception to the warrant requirement under the Hawai'i Constitution. With respect to Petitioner's challenge to the search and seizure in this case, it must be noted that "state courts are absolutely free to interpret state constitutional provisions to accord greater protection to individual rights than do similar provisions of the United States Constitution." *Arizona v. Evans*, 514 U.S. 1, 8, 115 S.Ct. 1185, 131 L.Ed.2d 34 (1995). Thus, "[i]f a state court chooses merely to rely on federal precedents as it would on the precedents of all other jurisdictions, then it need only make clear by a plain statement in its judgment or opinion that the federal cases are being used only for the purpose of guidance, and do not themselves compel the result that the court has reached." *Michigan v. Long*, 463 U.S. 1032, 1041, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983). The federal cases herein are used only to provide guidance as to the issues raised by Petitioner. Therefore, this case is not decided under the Fourth and Fourteenth Amendments of the United States Constitution. Article I, section 7 of the Hawai'i Constitution as opposed to federal law compels the result reached herein.

9. As discussed herein, the ICA decided this argument in Petitioner's favor in Respondent's first appeal. *See State v. Rodrigues*, 122 Hawai'i 229, 233, 236, 225 P.3d 671, 675, 678 (App.2010) (*Rodrigues I*). Respondent did not file an application for writ of certiorari contesting this ruling.

taken into [the] cell block, no weapons or dangerous instruments [are] taken in, for the safety of all the cell block personnel, as well as the safety of the suspect." He further stated that during this process the arrestee's pockets are searched.

Sergeant Eric Kaui (Sergeant Kaui) also testified on Respondent's behalf regarding the policies and procedures for conducting an inventory search. Sergeant Kaui explained that as part of the inventory search, the officer conducts a thorough search of the arrestee, including all of the arrestee's clothing.

On March 17, 2009, the court entered its Finding of Facts, Conclusions of Law and Order Granting Petitioner's Motion to Suppress (First Suppression Order).

### C.

Respondent appealed to the ICA arguing that the court erred in: (1) concluding based on *Enos* that the inevitable discovery rule was inapplicable; (2) rejecting application of the rule without entering any findings upon which its rejection was based; and (3) concluding that Respondent failed to establish by clear and convincing evidence that the methamphetamine was admissible pursuant to the rule. *Rodrigues* I, 122 Hawai'i at 233, 225 P.3d at 675.

As to (1), the ICA[10] stated that although, under *Enos*, Officer Williamson's search of Petitioner's pockets was not a valid search incident to lawful arrest, the court failed to consider whether the inevitable discovery rule established in *Lopez* applied. *Id.* at 236, 225 P.3d at 678.

As to (2), the ICA agreed that the court failed to enter any findings regarding Respondent's inevitable discovery argument. *Id.* The ICA determined that the court's failure constituted error in light of Hawai'i Rules of Penal Procedure (HRPP) Rule 12(e), which requires the court to "state its essential findings on the record" "[w]here factual issues are involved in determining a motion[.]"

As to (3), the ICA noted that although Respondent presented the testimony of Officer Williamson and Sergeant Kaui to support its inevitable discovery argument, the court made no findings regarding the credibility of the officers or the weight to be given to their testimony in light of the other evidence presented. *Id.* at 238, 225 P.3d at 680.

The ICA thus vacated the First Suppression Order and remanded to the court for entry of findings and conclusions regarding whether Respondent met its burden of establishing by clear and convincing evidence that the methamphetamine would have been inevitably discovered. *Id.*

### II.

Following remand, the court held hearings on June 15, 2010, June 29, 2010, and July 6, 2010. On July 26, 2010, Respondent filed a supplemental memorandum in support of applying the inevitable discovery rule (supplemental memo).

On August 5, 2010, the court filed its Findings of Fact, Conclusions of Law and Order Granting Petitioner's Motion to Suppress Evidence (Second Suppression Order). The court entered essentially the same findings that were set forth in the First Suppression Order, except for finding 9. The court's findings were as follows:

1. On November 28, 2008 at approximately 7:54 a.m., [Officer Williamson] saw [Petitioner] sleeping in a silver two-door Hyundai at Hanamaulu Beach Park.

2. Officer Williamson noticed that the safety check and vehicle registration stickers were expired on the vehicle.

3. Officer Williamson woke [Petitioner] and asked him for identification.

4. [Petitioner] could not provide Officer Williamson any identification or information pertaining to the vehicle.

5. Officer Williamson called police dispatch to request any information on [Petitioner].

6. *Officer Williamson discovered that [Petitioner] had three outstanding bench warrants and handcuffed him.*

---

**10.** The opinion in Petitioner's first appeal was filed by Chief Judge Craig H. Nakamura, the Honorable Katherine G. Leonard, and the Honorable Alexa D.M. Fujise.

7. Officer Williamson conducted a pat-down search on [Petitioner's] torso but when he got to [Petitioner's] shorts, Officer Williamson turned the pockets inside out.

8. Officer Williamson testified that for his safety it was his practice that when he conducts a search of an arrestee he pulls out the arrestee's pockets from the top rather than doing a pat-down search.

9. Officer Williamson testified that he had no reason to believe that [Petitioner] was concealing weapons, drugs, contraband, or needles.

10. As Officer Williamson turned [Petitioner's] left shorts' pocket inside out, he found a clear [plastic] baggie that contained a crystal-like substance in [Petitioner's] left front pocket.

11. Officer Williamson placed [Petitioner] in his police vehicle and transported him to [a cellblock.]

(Emphases added.) The court's conclusions 1 through 4 were also essentially the same as the conclusions set forth in the First Suppression Order. The court entered new conclusions 5 through 11:

1. [The] Fourth Amendment to the United States Constitution protects the rights of citizens to be free from unreasonable searches and seizures.

2. Article I, Section 7 of the Hawaii Constitution is identical to the Fourth Amendment to the United States Constitution.

3. Officer Williamson was entitled to a pat-down search but he was not authorized to remove the [methamphetamine] from [Petitioner's] pocket unless he had reason to believe that the items felt [were] fruits or instrumentalities of the crime for which [he was] arrested, or to protect the officer from attack, or to prevent the offender from escaping. [Enos, 68 Haw. at 511, 720 P.2d at 1014].

4. Any warrantless search or seizure is presumed to be illegal and the burden always rests with the government to prove that such actions fall within a specifically established and well-delineated exception to the warrant requirement. [State v. Ortiz, 67 Haw. 181, 683 P.2d 822 (1984)].

5. One [ ] exception [to the warrant requirement] is the inevitable discovery rule adopted by the Hawaii Supreme Court in 1995 in [Lopez, 78 Hawai'i at 433, 896 P.2d 889].

6. Regarding the inevitable discovery rule, the Hawaii Supreme Court "requires the prosecution to present clear and convincing evidence that any evidence obtained in violation of article I, section 7 of the Hawai'i Constitution would inevitably have been discovered by lawful means before such evidence may be admitted under the inevitable discovery rule." [Lopez, 78 Hawai'i at 451, 896 P.2d at 889].

7. The Hawaii Supreme Court further noted that "clear and convincing evidence means evidence that will produce in the mind of a reasonable person a firm belief as to the facts sought to be established." Id.

8. The inevitable discovery rule is not applicable because [Respondent] failed to produce clear and convincing evidence which would demonstrate that [Petitioner] was incapable of retrieving and discarding the contraband from his person without an officer's notice between the time of his arrest and the inventory search and that the evidence would have been inevitably discovered.

9. Officer Williamson failed to testify that [Petitioner] was retrained in such as way as to make him incapable of discarding the [plastic] baggie from his pocket between the time of his arrest and the inventory search had the [plastic] baggie not been obtained via Officer Williamson's illegal search.

10. [Respondent] did not present any evidence that Officer Williamson or another officer continuously observed [Petitioner] after being handcuffed or that Officer Williamson [n]ever left [Petitioner] unattended.

11. Additionally, unlike the defendant in [State v. Silva, 91 Hawai'i 111, 979 P.2d 1137 (1999), Petitioner ] never testified or acknowledged that he was unable to retrieve the contraband after being handcuffed.

(Internal quotation marks and brackets omitted.) (Emphases added.) The court again ordered the methamphetamine suppressed and precluded its use at Petitioner's trial.

### III.

### A.

Respondent appealed once again. In the second appeal, Respondent argued to the ICA that the court erred in (1) failing to make findings regarding the events that occurred after Petitioner was placed in the police transport vehicle and relevant to the inevitable discovery doctrine; (2) finding that Petitioner could have discarded the methamphetamine before the inventory search, although no evidence to that effect was adduced, and there was testimony that the methamphetamine would have been discovered during a routine inventory search; (3) concluding that the instant case is distinguishable from *Silva* because Petitioner did not testify that he was unable to retrieve the methamphetamine from his pocket after being handcuffed, although Petitioner's whereabouts were unknown at the time of remand; (4) concluding Respondent failed to present clear and convincing evidence that the methamphetamine would not have been inevitably discovered during the inventory search. *State v. Rodrigues,* No. 30692, 2012 WL 917514, at *3 (App. Mar. 19, 2012) (*Rodrigues II* ).

The ICA majority stated that the court "did not make factual findings regarding the events relevant to the issue of inevitable discovery" and instead, "appeared to require, as a matter of law, that evidence excluding other possible scenarios be presented by the prosecution (i.e., requiring the prosecution to negate any possibility that the defendant could discard the contraband without detection) in order to carry its burden of proof." *Id.* at *5. The ICA majority "decline[d] to endorse such a requirement, absent any evi-

dence that those alternative scenarios could reasonably have occurred." *Id.*

In the view of the ICA majority, Respondent presented clear and convincing evidence that the methamphetamine would have been discovered during the inventory. *Id.* The ICA majority ordered the Second Suppression Order vacated and the case remanded for trial. *Id.*

### B.

A dissenting opinion was filed by Judge Reifurth (hereinafter, "ICA dissent"). First, the dissent disagreed that the court did not make factual findings relating to the issue of inevitable discovery. *Id.* According to the dissent, the court added finding 9, and conclusions 9, 10, and 11,[11] all of which related to its conclusion that the inevitable discovery did not apply in this case.

Next, the ICA dissent pointed out that, "as it must in an inevitable-discovery case," Respondent "relied ... on a hypothetical[,]" i.e., that the methamphetamine would have been discovered during the inventory search. *Id.* at *7. But, because "[u]nder the inevitable discovery exception, 'the privacy rights of the citizens of the State of Hawaiʻi may turn upon the outcome of the hypothetical[,]'" the ICA dissent maintained "it is 'incumbent upon [the appellate court] to assure that [its] speculation is as close to correct as possible.'" *Id.* at *11 (quoting *Lopez,* 78 Hawaiʻi at 451, 896 P.2d at 907).

■ The ICA dissent noted that, although *Lopez* did not explicitly discuss the possibility that the defendant could have discarded or destroyed the evidence, *Lopez*'s ruling was "premised specifically on the fact that " 'the record lack[ed] the clear and convincing evidence necessary to show that the evidence recovered ... as a result of the illegal search, *would have still been there.*' "[12] *Id.*

---

11. The ICA dissent declared that although mislabeled, conclusions 9, 10, and 11 constituted findings that should be treated as such. *Id.* (quoting *Crosby v. State Dep't. of Budget & Fin.,* 76 Hawaiʻi 332, 340, 876 P.2d 1300, 1308 (1994) ("A determination that embraces an ultimate fact is a factual finding subject to the clearly erroneous

standard of review even though classified as a COL.")).

12. As stated by the ICA dissent, clear and convincing evidence is "an intermediate standard of proof greater than a preponderance of the evidence, but less than proof beyond a reasonable doubt required in criminal cases." *Rodrigues II,*

(quoting *Lopez*, 78 Hawai'i at 452, 896 P.2d at 908 (brackets omitted) (emphasis in original)). According to the ICA dissent, Respondent failed to adduce evidence addressing the likelihood that the methamphetamine would have remained in Petitioner's possession during his transport to the KPD cellblock. *Id.*

The dissent explained that "[a]rrestees have been known to discard evidence, and it is the State's burden, once the underlying search has been determined to be illegal, to establish by clear and convincing evidence that an arrestee would not be able to discard the evidence that the State contends would inevitably have been discovered." *Id.* For example, in *Williams v. State*, 784 S.W.2d 428 (Tex.Crim.App.1990), the police found cocaine beneath the patrol car's backseat where the handcuffed defendant was seated. In *State v. Jimenez*, 73 Conn.App. 664, 808 A.2d 1190 (2002), the police officer found cocaine in backseat of police car after transporting defendant who had been handcuffed and frisked for weapons. In *Simmons v. State*, 299 Ga.App. 21, 681 S.E.2d 712 (2009), an officer discovered cocaine wedged in backseat of police car even though defendant had been searched and handcuffed.

Moreover, in the ICA's dissent's view, Respondent's own evidence and arguments "tended to suggest that [Petitioner] might have been able to access his pocket after his arrest." *Id.* at \*9. For example, Officer Williamson testified that although "he had no reason to believe that Rodrigues was concealing any type of contraband, was armed, or had needles, he pulled out [Petitioner]'s pocket to look for a means of escape." *Id.* According to the ICA dissent, "[i]f an officer searches for a handcuff key or lock pick in an arrestee's pocket even though the arrestee is to be handcuffed and transported to a cell-block for an inventory search, it at least suggests that the officer believes that the arrestee may be able to access his pocket while handcuffed." *Id.*

Finally, the dissent took issue with what it viewed as the imposition upon Petitioner of the "a novel obligation to first introduce evidence that an alternative scenario could reasonably have occurred[,]" *id.* at \*6, although a defendant "is not required to present evidence or argument to disprove the State's claim of inevitable discovery." *Id.* at \*9. The ICA dissent stated, "If we are to "safeguard the privacy rights of our citizens against unlawful government intrusions,' " *Lopez*, 78 Hawai'i at 451 n. 29, 896 P.2d at 907 n. 29, and "if the heightened standard is meaningful," the prosecution's burden cannot be "conditioned upon the defendant ... explaining first the logical failings in the State's own hypothetical." *Rodrigues II*, 2012 WL 917514, at \*11 (brackets omitted).

## IV.

Petitioner lists the following questions in his Application filed on May 29, 2012:

1) Whether the ICA gravely erred in failing to disregard [Respondent's] points of error raised in its opening brief because the alleged errors were not brought to the attention to [sic] the [court] as required by HRAP Rule 28(b)(4).[13]

2) Whether the ICA majority gravely erred in holding that the [court] erred in concluding that the State failed to meet its burden that the packet containing methamphetamine would have been inevitably been [sic] discovered when the police con-

---

2012 WL 917514, at \*6 n. 1 (citing *Masaki v. Gen. Motors Corp.*, 71 Haw. 1, 15, 780 P.2d 566, 574 (1989)). It is a "degree of proof which will produce in the mind of the trier of fact a firm belief or conviction as to the allegations sought to be established, and requires the existence of a fact be highly probable." *Id.* (citing *Masaki*, 71 Haw. at 15, 780 P.2d at 574).

13. HRAP Rule 28(b) provides in relevant part as follows:
[T]he appellant shall file an opening brief, containing

...
(4) A concise statement of the points of error. stat[ing] ... where in the record the alleged error was objected to or the manner in which the alleged error was brought to the attention of the court or agency.
...
Points not presented in accordance with this section will be disregarded, except that the appellate court, at its option, may notice a plain error not presented.

ducted their inventory search prior to admitting [Petitioner] into the cellblock.

Respondent did not file a Response to the Application.

## V.

### A.

█ In connection with Petitioner's first question, Petitioner asserts that Respondent alleged certain findings were erroneous but "filed a notice of appeal" instead of "bringing its objection to the attention of the [ ] court." Hence, Petitioner maintains Respondent cannot point to where in the record the alleged errors were brought to the attention of the court, as required by HRAP Rule 28(b)(4). As stated, HRAP Rule 28(b)(4) requires in relevant part that an appellant's opening brief include "a concise statement of the points of error set forth in separately numbered paragraphs, and each error must state "where in the record the alleged error occurred[.]" "Points not presented in accordance with [HRAP Rule 28(b) ] will be disregarded, except that the appellate court, at its option, may notice a plain error not presented." Relying on State v. Anh Cong Bui, No. 28454, 2008 WL 2916355, at *1 (App. July 30, 2008), Petitioner contends Respondent's points of error should have been disregarded, and were not noticeable for plain error.[14]

In its Reply Brief to Petitioner's Answering Brief filed in the ICA, Respondent maintained that after remand, and at the final hearing, the court invited Respondent to file proposed findings and conclusions or a post-hearing memorandum. Respondent asserted that in contrast to Bui where the defendant did not ask the court to enter any specific findings, Respondent did urge the court in its supplemental memo to adopt findings regarding the inventory search and the relevant KPD policy, and to conclude that there was

clear and convincing evidence of inevitable discovery.

Although Petitioner suggested that Respondent should have objected to the court's alleged error after the Second Suppression Order was filed instead of filing a notice of appeal, Respondent stated the only way to do that would be to file a motion for reconsideration of the court's Second Suppression Order. But, according to Respondent, "neither the HRAP nor the HRS require [an appellant] to file a motion for reconsideration as a pre-condition of filing a notice of appeal."

### B.

On appeal, the ICA did not address Petitioner's argument that Respondent's points of error failed to comply with HRAP Rule 28(b)(4) and therefore must be disregarded. In the absence of a ruling by the ICA, this court must resolve the issue.

It appears Respondent's points of error did not violate HRAP Rule 28. First, in its supplemental memo, Respondent did urge the court to adopt findings that an inventory search was conducted pursuant to KPD procedures, that it presented clear and convincing evidence that the methamphetamine would have been inevitably discovered, and that Silva was controlling. Accordingly, Respondent did call the errors raised on appeal to the attention of the court.

Furthermore, Bui, 2008 WL 2916355, at *1, which Petitioner relies upon, is distinguishable. Unlike in Bui, here, Respondent did urge the court to adopt the findings it alleged were erroneously omitted from the Second Suppression Order, and raised arguments supporting the inevitable discovery exception in its memorandum in opposition to Petitioner's motion to suppress, and in its supplemental memo.

Finally, although Petitioner cites to several cases for the proposition that the appellate

14. In Bui, the circuit court denied the defendant's motion to suppress and issued written findings and conclusions. The defendant argued on appeal that several findings were clearly erroneous because the circuit court failed to make findings as to the time the events referenced in the findings took place. However, the ICA responded that the defendant did not state in his opening brief where in the record the alleged errors were brought to the attention of the circuit court. The ICA reviewed the defendant's challenges under the plain error standard of review, and determined that the circuit court's failure to include findings regarding the specific time of the events was not plain error.

courts have been reluctant to notice plain error where the *defendant* has failed to bring alleged error to the trial court's attention, those cases involved the waiver of an evidentiary objection at trial. This case does not involve the waiver of an evidentiary objection. Nor does this case involve a situation in which the court was never apprised of the position Respondent asserted on appeal. Hence, Respondent preserved its points of error in its filings with the court.

## VI.

As to his second question, Petitioner essentially adopts the position of the ICA dissent, that argued (1) the ICA majority erred in concluding the court failed to make the necessary findings relevant to inevitable discovery and (2) the ICA majority erred in concluding Respondent met its burden of proving the methamphetamine would have been inevitably discovered.

### A.

With respect to the first argument, Petitioner is correct that the court did enter findings to support its conclusion that the inevitable discovery exception did not apply. Petitioner maintains that finding 9 and conclusions 8, 9, 10, and 11 constitute the findings necessary to justify the court's ultimate conclusion. However, *all* of the court's findings relate to its conclusion. The court's findings were based on the evidence presented by Respondent concerning Petitioner's arrest, the unlawful search of Petitioner during which the methamphetamine was discovered, the matters that transpired up until the point Petitioner was placed in a cellblock, and the inventory search. Based on this evidence, the court determined Respondent had failed to prove inevitable discovery.

### B.

Respondent argued on appeal to the ICA that the court erred by failing to make findings regarding the events that occurred after Petitioner was placed in the police transport vehicle, and that the court erred in failing to make findings regarding Officer Williamson's

credibility and the weight that should be given to his testimony.

■ First, any absence of findings regarding the events that occurred during the transport of Petitioner may be attributed to Respondent. To reiterate, it is *Respondent* that had the burden of producing clear and convincing evidence that the methamphetamine would have been discovered during the inventory search. Consequently, as Petitioner asserts, Respondent failed to adduce relevant evidence regarding, for example, how Petitioner was restrained, whether Petitioner was able to access his pockets, whether Petitioner was being observed up until the point the inventory search was conducted or whether the back of the police vehicle was searched for contraband immediately prior to and after transport of Petitioner. Indeed, the court stated that Respondent "did not present any evidence that Officer Williamson or another officer continuously observed [Petitioner] after being handcuffed or that Officer Williamson [n]ever left [Petitioner] unattended." Conclusion 10.

■ Next, as related, Respondent argued on appeal to the ICA that the court erred by not making findings relating to the inventory search of Petitioner, including his pockets, and KPD's procedures for such searches. Respondent urged that the case should be remanded to the court with instructions for the court to enter a finding that Officer Williamson transported Petitioner to a KPD cellblock, and subjected him to a routine inventory search, including a search of his pockets. But, it is apparent from the court's conclusions that the court found the inventory search did take place.

For example, in conclusion 8, the court states that there was no evidence that Petitioner was incapable of retrieving and discarding the methamphetamine "from his person without an officer's notice *between the time of his arrest and the inventory search* [.]" (Emphasis added.) Likewise, conclusion 9 incorporates the court's finding that there was no evidence that Petitioner could not discard the methamphetamine "*between the time of his arrest and the inventory search* [.]" (Emphasis added.) There was no reason to remand the case to the court for an ex-

press finding that Officer Williamson conducted a routine inventory search on Petitioner's person inasmuch as Petitioner never disputed such inventory search took place, and it is obvious that the court accepted Officer Williamson's testimony that the inventory search had been conducted.

Additionally, notwithstanding the ICA majority's suggestion that the court was required to make express findings regarding credibility and weight, a court is not required to make express findings regarding credibility and weight. *See State v. Patterson,* 58 Haw. 462, 468, 571 P.2d 745, 749 (1977) ("The power to judge credibility of witnesses, resolve conflicts in testimony, weigh evidence and draw factual inferences, is vested in the trial court[,]" and "[o]n appeal all presumptions favor proper exercise of that power, and the trial court's findings *whether express or implied* must be upheld if supported by substantial evidence.") (Emphasis added.); *see also State v. Ganal,* 81 Hawai'i 358, 370, 917 P.2d 370, 382 (1996) (noting that "[i]n making its finding and order, the circuit court was required to weigh the testimony of the witnesses and judge their credibility[,]" and " 'the trial court's findings whether *express or implied* must be upheld if supported by substantial evidence' " (quoting *State v. Ganal,* 81 Hawai'i 358, 370, 917 P.2d 370, 382 (1996))) (emphasis added).

Moreover, the court's ultimate conclusion in this case did not hinge on the weight that was given to Officer Williamson's testimony. Indeed, the court accepted Officer Williamson's testimony as true. None of the parties disputed his testimony. The court concluded based on Respondent's evidence, and particu-

larly Officer Williamson's testimony, that Respondent had not established by clear and convincing evidence that the methamphetamine would have been inevitably discovered in the inventory search had it "not [otherwise] been obtained via Officer Williamson's illegal search." Conclusion 9. Because Respondent "failed to produce evidence which would demonstrate that [Petitioner] was incapable of retrieving and discarding the contraband from his person without an officer's notice between the time of his arrest and the inventory search[,]" and, therefore, that the methamphetamine "would have been inevitably discovered[,]" the court concluded that the "inevitable discovery rule [was] not applicable" in this case. Conclusion 8.[15]

Hence, the court included in its order sufficient facts from which this court can ascertain the steps by which the court reached its ultimate conclusion regarding the inevitable discovery issue, and the findings were thus sufficient. *See Nani Koolau Co. v. K & M Const., Inc.,* 5 Haw.App. 137, 140, 681 P.2d 580, 584 (App.1984) ("If [the] findings include sufficient subsidiary facts to disclose to the reviewing court the steps by which the lower court reached its ultimate conclusion on each factual issue, then the findings are adequate."). Plainly, the ICA erred in concluding that the court did not make sufficient findings relating to the inevitable discovery issue.

## VII.

Respondent maintains that, in *Silva,* 91 Hawai'i at 121, 979 P.2d at 1145, the ICA held under similar facts that the State pre-

---

15. Although Petitioner maintains conclusions 8 through 11 are findings, first, conclusions 8, 9, 10, and 11, may also be viewed as "inference[s] on a question of law, [i.e., whether Respondent had established by clear and convincing evidence that the methamphetamine would have been inevitably discovered,] made as a result of [the] factual showing" by Respondent. *Black's Law Dictionary* at 329. In other words, conclusions 8–11 reflect an "application of [the clear and convincing] legal standard" relating to the inevitable discovery exception. *Lundgren v. Freeman,* 307 F.2d 104, 115 (9th Cir.1962).

However, as Petitioner notes, the foregoing conclusions incorporate findings. For example, conclusion 8 was based on the court's apparent

finding that Respondent failed to present evidence that Petitioner's was retrained in such a manner so as to make him incapable of retrieving items from his pockets or discarding the methamphetamine between the time of his arrest and the inventory search. Conclusions 8, 9, and 10 were based upon the court's finding that Respondent did not present any evidence that Petitioner was incapable of discarding the methamphetamine between the time of his arrest and the inventory search. Finally, conclusion 11 reflects the court's finding that Respondent did not present evidence such as that in *Silva* that Petitioner was unable to reach the contraband while cuffed.

sented clear and convincing evidence that contraband obtained during a search incident to arrest would inevitably have been discovered during a pre-incarceration search. In *Silva*, the defendant moved to suppress items recovered from his pocket following his arrest. 91 Hawai'i at 113–14, 979 P.2d at 1139–40. The officer testified at the hearing on the motion to suppress that the pipe recovered from the defendant's pocket was sticking out from his pocket and in plain view. *Id.* The defendant on the other hand testified that the pipe was not in plain view. *Id.* at 114, 979 P.2d at 1140. According to the *Silva* majority, the circuit court did not enter any findings as to the validity of the search of the defendant's pockets and "therefore did not resolve the credibility issue presented by the conflicting testimonies ... regarding whether the seized evidence was in plain view." *Id.* at 120, 979 P.2d at 1146. "Instead, the circuit court concluded that the evidence would have inevitably been discovered during an inventory search of Defendant conducted upon his arrival and booking at the police station." *Id.*

On appeal, the *Silva* majority determined that the prosecution had "met its burden of proof." *Id.* However, the grounds upon which the evidence was admissible in *Silva* is ambiguous. *See id.* at 122, 979 P.2d at 1147–48 (Acoba J., concurring) ("The contraband was recovered following the arrest on the warrants, and validly so, as incident to arrest under the police version of the events, or pursuant to the inevitable discovery rule under [the d]efendant's recounting of the episode.") Hence, we do not find *Silva* to be controlling in this case.

Distinguishing *Silva*, the ICA dissent acknowledged that *Silva* involved a similar post-arrest transport to the cellblock where an inventory search would be conducted. (Citing *Silva*, 91 Hawai'i at 121, 979 P.2d at 1147). However, as the ICA dissent correctly observed, *Silva*, did not need to discuss whether the defendant could have discarded or destroyed the evidence because the defendant testified that he was unable to access his pockets while his hands were handcuffed. *Id.* (citing 91 Hawai'i at 114, 979 P.2d at 1140). In the instant case, Respondent's own evidence suggested that Petitioner might have been able to access his pockets even after he was handcuffed:

> Officer Williamson testified that despite the fact that he had no reason to believe that [Petitioner] was concealing any type of contraband, was armed, or had needles, he pulled out [Petitioner]'s pocket to look for a means of escape. In [Respondent's] opposition to the Motion to Suppress, [Respondent] posited that an officer needed to pull out an arrestee's pocket to look for a "means of escape like a handcuff key or lock pick."

*Rodrigues II*, 2012 WL 917514, at *9 (Reifurth J., dissenting).

## VIII.

### A.

■ With respect to Petitioner's second argument, it must be observed that Hawai'i's inevitable discovery exception to the exclusionary rule is unlike the federal exception. The inevitable discovery exception was first adopted by the United States Supreme Court in *Nix v. Williams*, 467 U.S. 431, 104 S.Ct. 2501, 81 L.Ed.2d 377 (1984) (*Williams II*). In *Williams II*, a 10–year–old girl disappeared from a YMCA. *Id.* at 434, 104 S.Ct. 2501. Shortly after she disappeared, Williams was seen leaving the YMCA carrying a large bundle wrapped in a blanket. *Id.*

Police suspected that Williams had left the girl or her body somewhere between Des Moines and a rest stop where the girl's clothing and a blanket similar to the one Williams was seen carrying were discovered. *Id.* at 435, 104 S.Ct. 2501. Two hundred volunteers divided into teams and searched that area. Meanwhile, Williams turned himself in to the local police in Davenport, and contacted an attorney in Des Moines. *Id.* Des Moines police informed Williams' counsel that they would bring Williams back to Des Moines without questioning him. *Id.* However, during Williams' transport, one of the detectives suggested that Williams should help them locate the young girl's body before it became covered by the snow so that she could have a "Christian burial." *Id.* at 435–36, 104 S.Ct. 2501. At some point thereafter, Williams

agreed to direct the officers to the girl's body. *Id.* At the time her body was discovered, one search team was two and a half miles away. *Id.*

In Williams' first trial, his counsel moved to suppress evidence of the girl's body and all related evidence on the ground that such evidence was the "fruit" of an illegally obtained statement. *Id.* at 437, 104 S.Ct. 2501. The trial court denied Williams' motion. *Id.* The Supreme Court held in *Brewer v. Williams,* 430 U.S. 387, 404–06, 97 S.Ct. 1232, 51 L.Ed.2d 424 (1977) (*Williams I* ), that the incriminating statements should have been suppressed because they were obtained in violation of Williams' right to counsel, and remanded for a new trial. *Williams I* noted, however, that the evidence " 'might well be admissible on the theory that the body would have been discovered in any event, even had incriminating statements not been elicited from Williams.' " *Id.* at 406 n. 12, 97 S.Ct. 1232.

In Williams' second trial, the trial court admitted evidence relating to the girl's body, on the ground that even if Williams had not led the police to the girl's body, it would have been discovered within a short time. *Williams II,* 467 U.S. at 436, 104 S.Ct. 2501. In *Williams II,* the Supreme Court was urged to adopt and apply an inevitable discovery exception to the exclusionary rule. *Id.* at 440.

*Williams II* explained that the independent source doctrine allows admission of unlawfully obtained evidence when such evidence is also discovered by means wholly independent of any constitutional violation. Although inapplicable to the case before it, *Williams II* concluded that the independent source doctrine was "wholly consistent with and justifie[d] adoption of the inevitable discovery exception to the exclusionary rule." *Id.* at 432. In light of this principle, the Supreme Court announced the following rule: "If the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means[,] ... then the deterrence rationale has so little basis that the evidence should be received." *Id.* at 444. *Williams II* ultimately determined the girl's

body inevitably would have been found. *Id.* at 449–50.

In dissent to the *Williams II* majority, Justice Brennan stated that "unconstitutionally obtained evidence may be admitted at trial if it inevitably would have been discovered in the same condition by an independent line of investigation that was already being pursued when the constitutional violation occurred." *Id.* at 459 (Brennan, J., dissenting). He believed the majority overlooked "the crucial difference between the 'inevitable discovery' doctrine and the 'independent source' exception from which it is derived." *Id.* Justice Brennan pointed out that, when properly applied, the independent source exception "allows the prosecution to use evidence only if it was, in fact, obtained by fully lawful means[,]" and thus, the doctrine "does no violence to the constitutional protections that the exclusionary rule is meant to enforce." *Id.*

On the other hand, under the inevitable discovery exception, "evidence sought to be introduced at trial has not actually been obtained from an independent source, but rather would have been discovered as a matter of course *if independent investigations were allowed to proceed.*" *Id.* (emphasis added). In other words, according to Justice Brennan, "[t]he inevitable discovery exception necessarily implicates a hypothetical finding that differs in kind from the factual finding that precedes application of the independent source rule." *Id.* In Justice Brennan's view, in order to ensure that the hypothetical "is as narrowly confined to circumstances that are functionally equivalent to an independent source, and to protect fully the fundamental rights served by the exclusionary rule, the government should "satisfy a heightened burden of proof before it is allowed to use such evidence[,]" i.e., clear and convincing evidence. In *State v. Lopez,* 78 Hawai'i 433, 451, 896 P.2d 889, 907 (1995), this court adopted Justice Brennan's view.

### B.

In *Lopez,* Sergeant Stephen Magnani (Sergeant Magnani), who was conducting an investigation of a drug-related conspiracy,

determined that a substantial amount of cocaine had been delivered to a house on Kala street in Puna, Hawai'i. 78 Hawai'i at 437, 896 P.2d at 893. Unrelated to the Sergeant's investigation, three armed marked men broke into the house of Kelly and Daniel Hauanio, located on Kala street, and robbed them. *Id.* An investigating officer suspected that the robbery was drug-related. *Id.* While the Hauanios were staying in a hotel following the robbery, Kelly's mother, without the Hauanios' permission, volunteered to take Detective Steven Guillermo (Detective Guillermo) to the Hauanios' home to continue the robbery investigation. *Id.* at 438, 896 P.2d at 894.

After entering the home, the detective confiscated a cellophane container filled with cocaine that he found in the master bedroom. *Id.* Based on information relating to the robbery and the discovery of the cocaine in the master bedroom, officers were able to obtain a search warrant for the Hauanio home. *Id.* Upon execution of the search warrant, the officers discovered evidence linking the Hauanios to the drug delivery on Kala street and evidence connecting them to the drug-conspiracy that was being investigated. *Id.*

Prior to the Hauanios' trial for several drug offenses, the Hauanios moved to suppress the evidence obtained from their home. *Id.* at 440, 896 P.2d at 896. This court held that the initial search of the Hauanio's home was unconstitutional. *Id.* at 447, 896 P.2d at 903. *Lopez* determined that the evidence was not obtained from an independent source, i.e., execution of the search warrant, because there was no information independent of Detective Guillermo's illegal entry of the Hauanio's home to support the warrant. *Id.* at 448, 896 P.2d at 904.

Next, this court considered the prosecution's argument that, although the entry into the Hauanio's home was unlawful, the evidence should not be suppressed because it would have been inevitably discovered by lawful execution of Detective Guillermo's search warrant or by the investigation conducted by Sergeant Magnani. *Id.* at 447, 896 P.2d at 903. In response, this court adopted the inevitable discovery exception announced in *Williams II*. However, unlike "the United States Supreme Court [majority which] has unequivocally stated that the primary purpose of the exclusionary rule on the federal level is to deter illegal police conduct," this court has said that "an equally valuable purpose of the exclusionary rule under [the Hawai'i Constitution] is to protect the privacy rights of our [residents]." *Id.* at 446, 896 P.2d 889. In other words, our constitution has "[t]he added protection against governmental 'invasions of privacy[.]'" *Id.* at 451, 896 P.2d at 907.

*Lopez* agreed with Justice Brennan that "the inevitable discovery exception necessarily requires speculation as to the outcome of hypothetical circumstances." *Id.* In order "to ensure that the added protection in the Hawai'i Constitution [of protecting individual privacy] is not vitiated by a 'bad guess,'" this court held that "evidence may be admitted under the inevitable discovery exception to the exclusionary rule" only if the prosecution "present[s] clear and convincing evidence that any evidence obtained in violation of article I, section 7, would inevitably have been discovered by lawful means[.]" *Id. Lopez* noted that this "higher burden of proof would assist in serving one of the main purposes of the exclusionary rule ... i.e., safeguarding the privacy rights of our [residents] against unlawful governmental intrusions." *Id.* n. 29.

Applying the foregoing to the case before it, this court first rejected the prosecution's argument that the evidence would have been inevitably discovered by lawful execution of Detective Guillermo's warrant because the information in support of the warrant was based on observations made when entry was made without the Hauanios' consent. *Id.* at 448, 896 P.2d at 904. Second, this court rejected the argument that the contraband would have been discovered pursuant to Sergeant Magnani's drug-conspiracy investigation on Kala street. *Id.* at 452, 896 P.2d at 908. This court reasoned that although Sergeant Magnani was "suspicious" that cocaine had been delivered to one of the homes on Kala street, he had not determined who occupied the houses, and there was no evidence that Sergeant Magnani possessed information necessary to obtain a search warrant to

search the Haaunio home. *Id.* In addition, even if Sergeant Magnani might have eventually obtained a search warrant, "the record lack[ed] the clear and convincing evidence necessary to show that the evidence recovered from the [defendants'] home as a result of [the] illegal search, *would have still been there.*" *Id.* (emphasis added).

## IX.

### A.

As *Lopez* declared, our exclusionary rule differs from its federal counterpart insofar as it protects individual privacy rights. 78 Hawai'i at 446, 896 P.2d at 902; *accord State v. Kahoonei,* 83 Hawai'i 124, 131, 925 P.2d 294, 301 (1996); *see also State v. Dixon,* 83 Hawai'i 13, 23, 924 P.2d 181, 191 (1996) (stating that "article I, section 7 of the Hawai'i Constitution provides broader protection than the [F]ourth [A]mendment to the United States Constitution because it also protects against unreasonable invasions of privacy"); *State v. Navas,* 81 Hawai'i 113, 123, 913 P.2d 39, 49 (1996) (stating that "article I, section 7 of the Hawai'i Constitution" provides a "more extensive right of privacy ... than that of the United States Constitution"); *State v. Tanaka,* 67 Haw. 658, 662, 701 P.2d 1274, 1276 (1985) ("In our view, article I, § 7 of the Hawai'i Constitution recognizes an expectation of privacy beyond the parallel provisions in the Federal Bill of Rights."). This "added protection against governmental invasions of privacy" demands that speculation regarding whether evidence obtained in violation of one's individual privacy would have been inevitably discovery be "as close to correct as possible." *Id.* at 451, 896 P.2d at 907. In other words, "to ensure that the added protection in the Hawai'i Constitution is not vitiated by a 'bad guess,' " Respondent was required "to present clear and convincing evidence that [the methamphetamine] obtained in violation of [Petitioner's constitutional rights] would inevitably have been discovered by lawful means before such evidence may be admitted under the inevitable discovery exception to the exclusionary rule." *Id.*

Here, the "hypothetical[,]" *id.,* posited by Respondent was that, although the methamphetamine was unlawfully seized, it would have been inevitably discovered during the inventory search prior to placing Petitioner in the KPD cellblock. However, without evidence establishing that the methamphetamine would have remained in Petitioner's pocket until the inventory search was conducted, or that any effort by him to discard it would have been detected, there was no clear and convincing evidence that the methamphetamine would have been otherwise inevitably discovered during the inventory search. In other words, the court could not be sure that Respondent's asserted hypothetical was "as close to correct as possible." *Id.*

### B.

Furthermore, unlike in *Williams II* and *Lopez,* there were no "independent line[s] of investigation that w[ere] already being pursued when the constitutional violation occurred[,]" and nothing establishing that the evidence would have been "discovered as a matter of course if independent investigations were allowed to proceed." *Williams II,* 467 U.S. at 459, 104 S.Ct. 2501 (Brennan, J., dissenting). Here, Officer Williamson agreed on cross-examination that he emptied Petitioner's pockets after his arrest for contempt of court, without first patting them down, and without any "reason to believe ... [Petitioner] was concealing any type of contraband[,]" thus precipitating the event that produced the contraband. It was this search that the ICA determined in *Rodrigues I,* 122 Hawai'i at 233–234, 225 P.3d at 675–76, violated the Hawai'i Constitution. Recovery of the methamphetamine was not the subject of any other lawful investigation. No facts indicate another investigation was being conducted that would have lawfully resulted in the recovery of the methamphetamine from Petitioner. *See Lopez,* 78 Hawai'i at 452, 896 P.2d at 908.

Under the ICA's majority conclusion that the methamphetamine would have been inevitably discovered in an inventory search, virtually every unconstitutional search incident to arrest, or any unconstitutional search of a defendant after his or her arrest, but prior to

his or her arriving at the cellblock, would be validated upon a showing by the State that, after the search, the defendant was transported to the cellblock and an inventory search conducted. This would defeat discrete exceptions to the general searches and seizures that are prohibited in Article 1, section 7 of the Hawai'i Constitution. Moreover, this would place the courts in the position of engaging in speculative analysis of hypothetical scenarios in virtually every instance where established and well-delineated bases for exceptions to the warrant requirement would otherwise apply. *See Ortiz,* 67 Haw. at 184, 683 P.2d at 825 (stating that "warrantless searches are presumptively unreasonable unless they fall within a specifically-established and well-delineated exception to the warrant requirement").

The evidence presented in this case does not meet the heightened burden of proof established in *Lopez.* Without evidence other than that of Petitioner's arrest and transport to the cellblock, there can be no assurance that the methamphetamine "would have still been there" at the time of the lawful inventory search, *Lopez,* 78 Hawai'i at 452, 896 P.2d at 908, and consequently, no way for the court to ensure that our constitution's protection of the privacy rights would not be "vitiated by a 'bad guess[.]' " *Id.* at 452, 896 P.2d at 908. The evidence was obtained by the unilateral act of Officer Williamson and was not the product of an "independent line of investigation," *Williams II,* 467 U.S. at 459, 104 S.Ct. 2501 (Brennan, J. dissenting), that would have culminated in discovery of the contraband. Under these circumstances, it cannot be concluded that the court was wrong in holding that Respondent failed to present clear and convincing evidence that the methamphetamine would have been discovered during the inventory search, and the ICA majority gravely erred in concluding otherwise.

### X.

In accordance with the foregoing, we vacate the April 3, 2012 judgment of the ICA, which vacated and remanded the August 5, 2010 Findings of Facts, Conclusions of Law and Order Granting Defendant's Motion to Suppress Evidence filed by the court, affirm said order, and remand to the court for further proceedings consistent with this opinion.